PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No.  10-1311

SILVIA MORENO GARCIA;
CLAUDIA MORENO GARCIA,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board Nos. A094-783-360 & A094-783-359)
Immigration Judge:  Henry S. Dogin

Argued  June 21, 2011

Before:  HARDIMAN and ALDISERT, *Circuit Judges*
and RESTANI [*] *Judge*.

[*]The Honorable Jane A. Restani, Judge of the United
States Court of International Trade, sitting by designation.

(Filed: November 28, 2011)

Rosa H. Soy [Argued]
2nd Floor
85 Park Street
Montclair, NJ 07042
        *Attorney for Petitioners*

Yedidya Cohen [Argued]
Eric H. Holder, Jr.
Kate D. Balaban
David V. Bernal
Susan K. Houser
Thomas W. Hussey
Gary J. Newkirk
Anthony C. Payne
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Attorneys for Respondent*

———————

OPINION OF THE COURT
———————

HARDIMAN, *Circuit Judge*.

Claudia Moreno Garcia (Claudia) and Silvia Moreno Garcia (Silvia) petition for review of an order of the Board of Immigration Appeals (BIA) affirming the decision of an

2

Immigration Judge (IJ) rejecting their applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Although we find sufficient merit in Silvia's petition to order a remand, we will deny Claudia's petition.

I[1]

Claudia was born on October 31, 1977, in Guatemala City, Guatemala. In late December 1998 or early January 1999, Claudia illegally entered the United States at San Ysidro, California. Claudia's younger sister Silvia was born on April 6, 1981, also in Guatemala City. Silvia illegally entered the United States at San Ysidro in October 2005.

A little over a year after Silvia entered the United States, the Department of Homeland Security served Claudia and Silvia with separate Notices to Appear, charging removability under the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(6)(A)(i). Both sisters conceded removability but applied for asylum, withholding of removal, and CAT protection, claiming that if they are returned to

---

[1] To the extent the Immigration Judge's factual findings are not so clearly erroneous that "any reasonable adjudicator would be compelled to conclude to the contrary," we accept them as "conclusive." 8 U.S.C. § 1252(b)(4)(B). *See infra* Part II.A. We also supplement the IJ's version of the facts and correct minor misstatements therein by including details found in Claudia's and Silvia's affidavits and testimony, but we do so only to the extent they do not conflict with the IJ's findings.

Guatemala, they will be persecuted by Valle del Sol, a violent gang the Guatemalan government allegedly cannot control.

Although the sisters' affidavits and testimony before the IJ indicate that their respective problems with Valle del Sol were distinct, both traced their problems with the gang back to their cousin, Hilda Marleny Sosa del Cid (Hilda). In 1986, shortly after Claudia and Silvia's father died, their mother moved to the United States, leaving her daughters with her sister Gloria. Hilda, who is one of Gloria's five children, is roughly the same age as Claudia. The sisters' living situation with their aunt Gloria and cousin Hilda was not ideal. Gloria withheld the money that Claudia and Silvia's mother sent them from the United States, and Hilda was violent and associated with gang members, one of whom, Jorge Solis Mexicanos, became her husband. Mexicanos was a career criminal and a leader of Valle del Sol.

II

A

We first consider Silvia's petition for review because it presents a closer question than Claudia's petition. In the summer of 2003, Hilda used Silvia's home telephone to help Valle del Sol assassinate a prominent human rights activist named Jose Lopez-Lopez. After the murder was accomplished, Hilda told Silvia that gang members Juan Carlos Munoz Castillo (aka "Topacio") and Dennis Marroquin participated in the crime and warned Silvia that she would be killed if she helped the authorities find Lopez-Lopez's killers. Silvia's safety concerns were exacerbated by the fact that she was pregnant at the time and also looking after her younger sister, Danay.

4

On August 14, 2003, the investigation of Lopez-Lopez's murder led police to Silvia, who refused to cooperate even after several hours of interrogation. At the end of their questioning, the police left, telling Silvia they would return the following day. Silvia then received a telephone call from an unknown woman who told her that Hilda was concerned that Silvia would report her to the police. The woman then requested a meeting with Silvia in a park. Silvia declined the invitation and went to stay with a friend instead.

The following day, Silvia met police officers at a church. She and the officers then traveled to a restaurant where they discussed the evidence against her (*i.e.*, the fact that a phone call that led to Lopez-Lopez's murder came from her house). The police threatened to arrest Silvia, but she refused to disclose any information. After leaving the restaurant, however, Silvia learned that her house had been ransacked. Too frightened to return home, Silvia fled to her grandfather's house but was turned away because her relatives feared retaliation from Hilda. Silvia then turned to a lawyer who recommended she leave Guatemala City and not tell anyone where she was going, but added that she should call him in a few days. Silvia followed the lawyer's advice and went to stay with a friend several hours away in the city of Escuintla.

When Silvia called the lawyer, he told her there was nothing he could do and it was unlikely any lawyer would take her case. He explained that Silvia had two options: side with the authorities or with Valle del Sol. That day, Silvia contacted officials from Guatemala's Public Ministry and arranged a meeting at a restaurant. Officers transported her from the restaurant to another building where, for the first time, Silvia agreed to give a statement implicating Hilda,

5

Topacio, and Marroquin. In return for her assistance with the prosecution, the Public Ministry officials agreed to place Silvia and her sister Danay in witness protection until Silvia testified and then relocate them to another country.

While in witness protection, Silvia and Danay were protected around the clock by armed security teams. In addition, they were moved from hotel to hotel as many as twelve times in three months because of potential security breaches. At various times prior to trial, security personnel were forced to transport Silvia and Danay in armored cars, strictly control their food, keep them away from windows, and arrange for a special trip to the hospital to address a problem with Silvia's pregnancy.[2]

Silvia claimed that despite these security precautions, Hilda threatened her over the phone. Silvia also learned that Marroquin had evaded trial and disappeared, and that Hilda's brother, Henry Sosa, was threatening Claudia and her mother in the United States.

Silvia appeared in court twice in October 2003. The first time, she did not testify because the defendants, Hilda and Topacio, were not given proper notice. Two weeks later, Silvia testified under oath outside the presence of the defendants while wearing a disguise and a bulletproof vest. Notwithstanding these precautions, Silvia received a phone call from an unknown individual who said that Silvia was being watched during her first court appearance and that if she testified, she and Danay would be killed. The caller also

---

[2] By the time arrangements were made for Silvia to get to the hospital, it was too late, and she suffered a miscarriage.

mentioned that Henry Sosa knew where her mother and Claudia were living in the United States.

A little over a month after Silvia testified, she and Danay were relocated to Mexico, where the Guatemalan and Mexican governments, along with the United Nations and other international organizations, arranged for them to register as refugees. In Mexico City, Silvia and Danay met with representatives from Mexico's refugee commission, the Comisión Mexicana de Ayuda a Refugiados (COMAR), as well as two non-governmental organizations and the United Nations. They were taken to a hotel, and Guatemalan officials remained in Mexico City to assist in their transition.

Approximately two months later, in February 2004, Silvia and Danay were granted refugee status in Mexico, which permitted them to remain in the country as long as they renewed their status annually. According to Silvia, however, the threats persisted. In the spring of 2004, Silvia saw Dennis Marroquin on the subway. After Silvia reported the encounter to COMAR, she and Danay were relocated to Guadalajara, Mexico, where they were placed in refugee housing. Meanwhile, Hilda, who was in prison at the time, kept calling.

In September 2005, Danay and Silvia's relationship fractured, and Danay left Mexico for the United States. Silvia claimed that for the rest of her time in Mexico, she was discriminated against and treated poorly because of her refugee status, which made it difficult to find a job. Consequently, she decided to move to Tijuana, Mexico, so she could enter the United States. Once in the United States, Silvia moved to New Jersey where she lived with her mother and Claudia.

Silvia testified before the IJ that Henry Sosa called her in the United States and told her to recant her testimony. Silvia refused to do so, and Hilda was convicted. Silvia also testified that she later saw Sosa on the street in New Jersey and that he began calling her house, telling her Hilda would soon get out of prison and implying that some harm would befall Silvia once Hilda was released. Silvia also testified that Hilda has been released from prison and unsuccessfully attempted to enter the United States.

B

The IJ issued an oral decision denying Silvia's application, finding that she was barred from receiving asylum because she had firmly resettled in Mexico before entering the United States. Oral Decision of the IJ, Garcia & Garcia, File Nos. A094783360 & A094783359, at 18–19 (June 2, 2008) (IJ Dec.). The IJ also determined that although there was "a plethora of documentation about Silvia's testimony, [and] Silvia's assistance in the prosecution against Hilda," she was not eligible for asylum or withholding of removal because any persecution she might face is not on account of her membership in a cognizable "particular social group" (*i.e.*, individuals who testify against gang members). *Id.* The IJ noted that there was no corroborating evidence regarding Sosa or the threat he might present in the future, and that even if Sosa might look to harm Silvia, the Guatemalan government had shown it was willing and able to protect her. *Id.* at 19–21. Finally, the IJ rejected her CAT claim citing a lack of evidence that the Guatemalan government would acquiesce in, or turn a blind eye to, her torture. *Id.* at 21.

8

Silvia appealed, and the BIA issued an opinion affirming the IJ's decision. The BIA relied primarily on two of the IJ's findings: (1) "that Silvia did not demonstrate an objectively reasonable fear of future persecution in Guatemala because she did not show that she is unable or unwilling to avail herself of the protection of the Guatemalan government;" and (2) "that the Guatemalan government is willing to protect Silvia such that she cannot be considered a 'refugee' within the meaning of the [INA]." Decision of the BIA, File Nos. A094783360 & A094783359, at 2 (Dec. 31, 2009) (BIA Dec.) (citing 8 C.F.R. § 1208.13(b)(2)(i)(C)). The BIA added in a footnote that it "also concur[s] with the [IJ]'s alternative ruling that the harm [Silvia] fears is not on account of a protected ground."[3] *Id.* at 4 n.1. Both sisters' CAT claims were rejected for the reason stated by the IJ. *Id.* at 2–3.

Silvia filed a petition for review, arguing that the BIA adopted the IJ's opinion without providing its own analysis,

---

[3] The IJ did not actually discuss the "on account of" element of an asylum claim. We assume that the BIA was referring to the IJ's finding that Silvia was not a member of a "particular social group," IJ Dec. at 19, 22, and that is the finding we will review. The Government agrees with this understanding of the BIA opinion. *See* Appellee's Br. at 30 n.9 (noting that the agency has not yet considered "whether . . . there is a nexus between the harm [Silvia] suffered or fears and a protected ground").

and that the IJ applied an incorrect legal standard, ignored precedent, and disregarded evidence.[4]

C

"We exercise *de novo* review over constitutional claims or questions of law and the application of law to facts." *Yusupov v. Att'y Gen.*, 518 F.3d 185, 197 (3d Cir. 2008) (citations omitted) (internal quotation marks omitted). The IJ's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Under this "extraordinarily deferential standard," *Abdulrahman v. Ashcroft*, 330 F.3d 587, 598 (3d Cir. 2003), findings of fact "will be upheld if [they are] 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Lin-Zheng v. Att'y Gen.*, 557 F.3d 147, 155 (3d Cir. 2009) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

When the BIA adopts or defers to the underlying decision of the IJ, we review the IJ's opinion as the decision of the agency. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001). As the Government argues, however, "review

---

[4] The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15, which grant it appellate jurisdiction over "[d]ecisions of Immigration Judges in removal proceedings." We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). *See also Chen v. Ashcroft*, 376 F.3d 215, 221–22 (3d Cir. 2004). Venue is proper in this Court because removal proceedings were completed in Newark, New Jersey. 8 U.S.C. § 1252(b)(2).

of the immigration judge's decision would be proper in this case . . . only to the extent affirmed or incorporated by the Board." Appellee's Br. at 21 n.3 (citing *Sheriff v. Att'y Gen.*, 587 F.3d 584, 588 (3d Cir. 2009)). In this case, the BIA agreed with several of the IJ's findings but did not adopt all of them. Accordingly, we may affirm the BIA's decision only if we find that its stated reasons are correct, as it was the BIA—not the IJ—that provided the final and authoritative "grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Li v. Att'y Gen.*, 400 F.3d 157, 163 (3d Cir. 2005) (reviewing only BIA's finding that "assuming [petitioner] was credible, he failed to establish past persecution," not IJ's adverse credibility determination, because BIA did not adopt credibility finding); *cf. Dia v. Ashcroft*, 353 F.3d 228, 241 (3d Cir. 2003) (holding that under *Chenery*, when the BIA affirms the IJ without opinion, we review the IJ's opinion as "the grounds invoked by the agency").

D

1

With the aforementioned standards in mind, we turn to Silvia's petition for review. We begin by noting that Silvia did not argue in her opening brief that the BIA erred in denying her CAT claim, so that issue is waived. *See Lie v. Ashcroft*, 396 F.3d 530, 532 n.1 (3d Cir. 2005) (citing *Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal.")). Thus we review only Silvia's requests for asylum and withholding of removal.

11

Whereas an application for withholding of removal requires a showing that there is a "clear probability" of persecution in the country to which an applicant will be removed, *Chen v. Gonzales*, 434 F.3d 212, 216 (3d Cir. 2005) (citing 8 U.S.C. § 1231(b)(3)(A)), an application for asylum must establish only that the applicant is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i); 8 C.F.R. § 1208.13(b)(1). "[A]n applicant has a well-founded fear of persecution if . . . [t]here is a reasonable possibility" that she will suffer it, 8 C.F.R. § 1208.13(b)(2)(i), and a showing of past persecution creates a rebuttable presumption of such a well-founded fear, 8 C.F.R. § 1208.13(b)(1). The persecution "must be committed by the government or forces the government is either unable or unwilling to control." *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006) (citing *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005)).

2

The Government argues that Silvia did not establish her "[inability] or unwilling[ness] to avail herself of the protection of the Guatemalan government." Our review of the record compels us to disagree.

The parties agree that Silvia's conflict with Hilda and Valle del Sol began when she initially decided to assist the Guatemalan government and seek its protection—a decision that left her and her sister Danay under armed guard, moving from hotel to hotel each time there was a feared security

12

breach. Ultimately, the Guatemalan authorities took the drastic measure of working with the Mexican government, the United Nations, and several international organizations to obtain refugee status for Silvia and Danay in Mexico. These extraordinary measures demonstrate that the Guatemalan government believed there was a "reasonable possibility" Silvia would be persecuted if she remained in Guatemala. For that reason, we find no support for the BIA's finding that Silvia does not have a reasonable fear of persecution if she is returned there.

Although the Guatemalan government displayed great willingness to protect Silvia before and after her testimony in the Lopez-Lopez murder trial, this willingness sheds no light on Guatemala's *ability* to protect her. The fact that Guatemala saw fit to relocate Silvia to Mexico is tantamount to an admission that it could not protect her in Guatemala. Guatemala's decision to move Silvia may have prevented future harm, but it does not constitute "protection" in the same way that a government's law enforcement apparatus protects its people by maintaining a state of law and order. There is nothing in the record to suggest that Guatemala will be any better able to protect Silvia if she is returned there now. We see no reason to doubt, then, that Silvia fears retaliation from the same individuals and organization that the Guatemalan government could not control eight years ago. Accordingly, the BIA's finding that she has failed to meet this element is not supported by substantial evidence.

The BIA's alternative holding—that any persecution Silvia might face in Guatemala would not be based on her membership in a "particular social group"—also is not supported by substantial evidence. In *Fatin v. INS*, 12 F.3d 1233, 1239–40 (3d Cir. 1993), we adopted the interpretation

13

of "particular social group" that the BIA announced in *Matter of Acosta*, 19 I. & N. Dec. 211 (B.I.A. 1985). Under *Acosta*, a "particular social group" is defined as:

> [A] group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. [T]he common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

19 I. & N. Dec. at 233. The parties agree that Silvia testified against Hilda and other members of Valle del Sol. She therefore shares a "common, immutable characteristic" with other civilian witnesses who have the "shared past experience" of assisting law enforcement against violent gangs that threaten communities in Central America. It is a characteristic that members cannot change because it is based on past conduct that cannot be undone. To the extent that members of this group can recant their testimony, they "should not be required to" do so.[5]

---

[5] The BIA has rejected a similar social group comprised of "noncriminal informants," finding that it lacked the "particularity" and "social visibility" required under the BIA's new interpretation of the phrase "particular social group." *In re C-A-*, 23 I. & N. Dec. 951, 957, 959–61 (B.I.A.

14

The BIA has not yet addressed several other elements of Silvia's application for asylum and withholding of removal—including whether the harm she might face in Guatemala rises to the level of persecution, whether there would be a nexus between any persecution and her membership in a particular social group, and whether she was "firmly resettled" in Mexico such that she is barred from receiving asylum under 8 C.F.R. § 1208.13(c)(2)(i)(B). We leave these matters to the BIA on remand. *See I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).

III

Unlike Silvia, Claudia's interactions with Valle del Sol were quite limited, she never testified against Hilda or any of Hilda's associates, and she never requested protection from the Guatemalan government. Claudia's claim is based on her

---

2006), *aff'd sub nom. Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1196 (11th Cir. 2006), *cert. denied sub nom. Castillo-Arias v. Gonzales*, 127 S. Ct. 977 (2007). *In re C-A-* is distinguishable, however, in that it involved confidential informants whose aid to law enforcement was not public, whereas in this case, Silvia's identity is, and always has been, known to her alleged persecutors. Moreover, in *Valdiviezo-Galdamez v. Attorney General of the United States*, we held that the BIA has failed to sufficiently explain and justify its addition of "particularity" and "social visibility" to the traditional *Acosta* requirements. **---** F.3d ----, No. 08-4564, 2011 WL 5345436, at *22 (3d Cir. Nov. 8, 2011). Until the BIA provides an analysis that adequately supports its departure from *Acosta*, we remain bound by the well-established definition of "particular social group" found in *Fatin*.

belief that she will be persecuted either because she is Silvia's sister or because she became friendly with Hilda in 1998 and learned about Valle del Sol activities, but then rejected what she perceived to be attempts at recruitment into the gang. Like Silvia, Claudia claimed that Hilda and Henry Sosa found her and her mother living in New Jersey and threatened them in person and by telephone. Claudia also alleged that Hilda has since been released from prison and tried to enter the United States, but she was turned away at the border.

The IJ found, and the BIA agreed, that Claudia's asylum application was time-barred and that, in any event, she was unable to show a clear probability of future persecution because she never sought police protection, the Guatemalan authorities went to great lengths to protect her sister Silvia, and she failed to provide evidence to corroborate her affidavit and testimony about threats. IJ Dec. at 14–18; BIA Dec. at 2–3. The BIA also affirmed the IJ's holding that Claudia was not entitled to relief under CAT because she could not show that the Guatemalan government would acquiesce in, or turn a blind eye to, her torture. IJ Dec. at 18; BIA Dec. at 3. Claudia does not dispute the BIA's findings that her asylum application was untimely and that she failed to establish a claim under the CAT. Thus we review only Claudia's request for withholding of removal.

To qualify for withholding of removal under the INA, an alien must show either (1) that she has suffered past persecution in the country of removal "on account of race, religion, nationality, membership in a particular social group, or political opinion," in which case, a rebuttable presumption of future persecution applies; or (2) that she will be persecuted in the country of removal—*i.e.*, there is a "'clear probability' that the alien's life or freedom would be

threatened upon her removal to a particular country," *Chen*, 434 F.3d at 216 (quoting *INS v. Stevic*, 467 U.S. 407, 412 (1984)) (citing 8 U.S.C. § 1231(b)(3)(A))—for one of the same reasons (race, religion, etc.). 8 C.F.R. § 208.16(b)(1)–(2); *Myat Thu v. Att'y Gen.*, 510 F.3d 405, 413 (3d Cir. 2007) (quoting 8 U.S.C. § 1101(a)(42)(A)) (internal quotation marks omitted). Under the "clear probability" standard, the applicant must show that persecution would "more likely than not" occur. § 208(b)(1)(iii), (2); *Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 228 (3d Cir. 2011). "[A]s with any claim of persecution, the acts must be committed by the government or forces the government is either unable or unwilling to control." *Sukwanputra*, 434 F.3d at 637 (citation omitted).

Nothing in the record compels us to reach factual findings contrary to those reached by the IJ in respect to Claudia's case. Claudia admitted during her testimony that she never personally contacted law enforcement in Guatemala about her interactions with Hilda and Valle del Sol, and although she may have been understandably fearful while she was living in Guatemala, there is nothing in the record to support a finding that she was ever persecuted in the past. Claudia must therefore show a clear probability of future persecution, which she cannot do in light of the IJ's finding that Claudia and Silvia failed to corroborate their testimony about threats Claudia allegedly received after she entered the United States. There is no reason for us to upset the IJ's determination that such corroboration could reasonably be expected and that Claudia and Silvia did not adequately explain its absence. *See Abdulai*, 239 F.3d 554 (announcing three-part inquiry for whether an application may be denied based on a failure to corroborate). On this record, we agree with the BIA that Claudia failed to meet her burden of

17

showing it is more likely than not that she will face persecution in Guatemala. We will therefore deny Claudia's petition for review.

## IV

For the reasons stated, we will deny Claudia's petition for review, grant Silvia's petition for review, and remand Silvia's case to the BIA for proceedings consistent with this opinion.