**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1793
_____

BRAYAN ANTONIO GUZMAN ORELLANA,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A216-282-709)
Immigration Judge:  Leo A. Finston

_____

Argued on December 10, 2019

Before:  RESTREPO, ROTH and FISHER, <u>Circuit Judges</u>

(Opinion filed:  April 17, 2020)

J. Wesley Earnhardt
Troy C. Homesley, III
Brian Maida                    (**ARGUED**)
Cravath, Swaine & Moore
825 Eighth Avenue
Worldwide Plaza
New York, NY 10019

Counsel for Petitioner

Madeline Henley
Greg D. Mack                   (**ARGUED**)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Counsel for Respondent

---

O P I N I ON

---

**ROTH**, Circuit Judge:

After overhearing the murder of his two next-door neighbors and facing repeated threats from local gang members for his perceived role in assisting law enforcement, petitioner Brayan Antonio Guzman Orellana left his home in El Salvador and entered the United States seeking relief

pursuant to the Immigration and Nationality Act (INA) and the Convention Against Torture (CAT). The Immigration Judge (IJ) denied his application, and the Board of Immigration Appeals (BIA) dismissed his appeal. We must now decide three issues: (1) whether persons who publicly provide assistance to law enforcement against major Salvadoran gangs constitute a cognizable particular social group for purposes of asylum and withholding of removal under the INA, (2) whether Guzman has established that he suffered past persecution on account of anti-gang political opinion imputed to him, and (3) whether the BIA correctly applied the framework we enunciated in *Myrie v. Attorney General*[1] in denying Guzman relief under the CAT. For the reasons that follow, we hold that persons who publicly provide assistance against major Salvadoran gangs do constitute a particular social group, that Guzman has failed to meet his burden to show that imputed anti-gang political opinion was a central reason for the treatment he received, and that the BIA erred in its application of *Myrie* to Guzman's application. Accordingly, we will vacate the BIA's decision and remand this case for further proceedings on Guzman's petition for relief from removal.

## I. BACKGROUND AND PROCEDURAL HISTORY

Guzman is a native of El Salvador. He grew up in a neighborhood controlled by Mara Salvatrucha, a gang commonly known as MS-13. On October 5, 2017, when Guzman was 18 years old, his two next-door neighbors were murdered. Earlier that night, a member of MS-13 had warned Guzman's family "not to speak to or call the police regarding

---

[1] 855 F.3d 509 (3d Cir. 2017).

whatever [they] saw or heard in the next couple of hours."[2] Shortly thereafter, Guzman overheard the murder as it took place.

About a week later, the police visited Guzman's neighborhood and, in front of Guzman's house, questioned him about his missing neighbors. Fearing that harm would come to him and his family if he cooperated with the police, Guzman told them that he knew nothing. However, Teco, a former classmate of Guzman's and an MS-13 member who may have been involved in the murder, witnessed Guzman talking to the police. At the end of the conversation, the police climbed over the wall between Guzman's house and his neighbors' and discovered the neighbors' bodies in their backyard.

A few days after Guzman was seen with the police, Teco and four other MS-13 members ambushed and attacked him on his way home from school. Teco made it clear that they did so because they believed Guzman was a "snitch."[3] Guzman, bruised from the encounter, left his home the next day to stay with his aunt who lived an hour away. A few days later, Guzman, again on his way home from school, was pulled into an alley by Teco and another MS-13 member named Pelón. Pelón put a gun to Guzman's head and told him he had to "cooperate with the gang."[4] Guzman refused but was ultimately let go.

After this second encounter, Guzman decided that he was no longer safe in El Salvador due to the pervasive gang

---

[2] Administrative Record (AR) 722–23.

[3] *Id.* at 727.

[4] *Id.* at 728.

presence there. He fled the country in November 2017 and applied for admission when he entered the United States a month later. The Department of Homeland Security detained him and served him with a Notice to Appear charging him as being removable for failing to present any valid document required for entry.[5] Guzman filed an application for asylum and withholding of removal under the INA and for deferral or withholding of removal under the CAT. In support of his application for relief under the INA, he claimed that he had suffered past persecution in El Salvador and that, if removed, there was a clear probability that his life or freedom would be threatened on account of his imputed membership in the particular social group of "complaining witnesses against major Salvadoran gangs" and his imputed anti-gang political opinion.

In support of his application for relief under the CAT, Guzman claimed that it is more likely than not that he would be subject to torture or death if returned to El Salvador, citing the fact that MS-13 members in his neighborhood knew him and had been looking for him. His application was supplemented by an affidavit from a licensed clinical social worker who interviewed him about the series of events involving the murder and diagnosed him with Post-Traumatic Stress Disorder (PTSD).

The IJ denied Guzman's application despite finding Guzman to be credible. The IJ first held that Guzman was not eligible for relief under the INA because he could not show that he suffered past persecution or that his life or freedom would be threatened on either ground he had asserted. According to

---

[5] Guzman is still being detained.

the IJ, Guzman was not a "complaining witness" since he did not provide any information to or file a complaint with the police and since imputed membership in a particular social group is insufficient for purposes of seeking relief under the INA. In addition, the IJ stated that Guzman presented no evidence suggesting that MS-13 deemed his actions to be an expression of anti-gang political opinion. The IJ then held that Guzman was also ineligible for relief under the CAT after finding that it was not more likely than not that Guzman would be tortured upon returning to El Salvador and that Guzman had not established that the Salvadoran government consented to or acquiesced in gang violence against Salvadorans.

The BIA dismissed Guzman's appeal. With respect to Guzman's application for relief under the INA, it held that "complaining witnesses against major Salvadoran gangs" do not constitute a particular social group and that Guzman failed to show that he was targeted by MS-13 on account of any imputed political opinion. With respect to Guzman's application for relief under the CAT, the BIA affirmed the IJ's determination that Guzman was not likely to be subject to torture upon removal but did not discuss whether the Salvadoran government would consent to or acquiesce in any torture Guzman might suffer upon removal. Guzman petitioned this Court for review of the BIA's final order of removal, arguing that the BIA erred in concluding that (1) he was not an imputed member of a particular social group, (2) he was not persecuted on account of his political opinion, and (3) he was not eligible for relief under the CAT.

## II. DISCUSSION

We have jurisdiction over this timely petition for review

6

of a final order of removal under 8 U.S.C. §§ 1252(a)(1) and 1252(b)(1). Although our jurisdiction only extends to final orders of removal and thus only to decisions of the BIA,[6] we also review the IJ's decision to the extent it is adopted, affirmed, or substantially relied upon by the BIA.[7]

We must resolve three issues in this appeal. The first issue—whether persons who publicly provide assistance to law enforcement against major Salvadoran gangs constitute a particular social group for purposes of the INA—presents a mixed question of law and fact. We review the BIA's legal conclusion as to the existence of a particular social group de novo while reviewing its underlying factual conclusions for substantial evidence.[8] The substantial evidence standard requires us to defer to factual findings below as long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole.[9] However, deference is not due "where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole," and the BIA "is not permitted simply to ignore or misconstrue evidence."[10] The second issue—whether Guzman has established that he suffered past persecution because of anti-gang political opinion

---

[6] *Abdulai v. Ashcroft*, 239 F.3d 542, 548–49 (3d Cir. 2001).
[7] *Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011), *as amended* (Jan. 13, 2012); *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009), *as amended* (Nov. 4, 2009).
[8] *See S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 542–43 (3d Cir. 2018).
[9] *Garcia*, 665 F.3d at 502 (internal quotation marks omitted).
[10] *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 107 (3d Cir. 2010) (internal quotations omitted).

imputed to him—presents a factual question subject to the substantial evidence standard.[11]  Finally, the third issue—whether the BIA correctly applied *Myrie* to the instant case—presents a mixed question of law and fact which we review under the same standards as the first issue.[12]

### A.  Guzman's Application for Relief under the INA

To be eligible for asylum under the INA, an applicant must demonstrate refugee status by showing that he has suffered past persecution or has a well-founded fear of future persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion.[13] A fear of future persecution is well-founded if there is a reasonable probability that persecution will occur, and a showing of past persecution creates a rebuttable presumption that the fear is well-founded.[14]  In addition, the applicant must establish that one of the five statutorily protected grounds "was or will be at least one central reason" for his persecution and

---

[11] *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481–84 (1992) (analyzing the causal connection between political opinion and persecution as a factual question); *Cruz-Diaz v. I.N.S.*, 86 F.3d 330, 331–32 (4th Cir. 1996), *as amended* (May 29, 1996) (same).

[12] *See Kang v. Att'y Gen.*, 611 F.3d 157, 164 (3d Cir. 2010) ("[W]e will uphold the BIA's reversal of the IJ's grant of CAT relief if there is substantial evidence supporting the BIA's conclusion that the IJ clearly erred in finding a likelihood of torture, or if we determine that the alleged mistreatment does not legally constitute torture.").

[13] 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A).

[14] 8 C.F.R. § 1208.13(b).

that the harm was caused by the government or by forces that the government is unable or unwilling to control.[15] To be eligible for withholding of removal under the INA, which is a separate form of relief, the standard is higher still, as the applicant must demonstrate that there is a "clear probability" that, upon his removal, his life or freedom will be threatened on account of one of the protected grounds.[16]

Addressing Guzman's first claim that he is eligible for asylum and withholding of removal under the INA on account of his imputed membership in a particular social group consisting of complaining witnesses against major Salvadoran gangs, we conclude that remand is appropriate. To establish a particular social group, an applicant must show that it is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[17] After our review of the situation in El Salvador, we conclude that the group of persons, who publicly provide assistance to law enforcement against major Salvadoran gangs satisfies all three criteria and, thus, constitutes a particular social group.[18]

---

[15] 8 U.S.C. § 1158(b)(1)(B)(i); *Kibinda v. Att'y Gen.*, 477 F.3d 113, 119 (3d Cir. 2007).

[16] *Chen v. Gonzales*, 434 F.3d 212, 216 (3d Cir. 2005) (internal quotation marks omitted).

[17] *S.E.R.L.*, 894 F.3d at 547; *see also Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014).

[18] The government urges us to apply deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), to the BIA's determination on this question, albeit with respect to Guzman's formulation of the group. However,

A shared common immutable characteristic can be "an innate one such as sex, color, or kinship ties, or in some circumstances . . . a shared past experience such as former military leadership or land ownership."[19] We held previously in *Garcia v. Attorney General* that persons who have assisted law enforcement against violent gangs that threaten communities in Guatemala share a common, immutable characteristic because they have the shared experience of assisting law enforcement, which is based on past conduct that cannot be undone and that they should not be asked to undo.[20]

*Garcia* concerned a witness who testified in court about a gang-related murder.[21] Since Guzman did not testify in court, the BIA considered his case to be distinguishable from *Garcia*. That is too narrow a reading. In our analysis, it is indistinguishable whether someone testifies in court or publicly provides out of court assistance to law enforcement. In both circumstances, that person will have been visible to the public and is likely be targeted because of his cooperation.

---

*Chevron* deference is inapplicable here because we are deciding as a matter of law whether our precedent—and that of other courts—forecloses relief for Guzman. *See Akins v. FEC*, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc) ("There is therefore no reason for courts—the supposed experts in analyzing judicial decisions—to defer to agency interpretations of the Court's opinions."), *vacated on other grounds by FEC v. Akins*, 524 U.S. 11 (1998).

[19] *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on different grounds*, 19 I. & N. Dec. 439 (BIA 1987).

[20] 665 F.3d at 504.

[21] *Id.* at 500.

In *Garcia*, we distinguished the witness who testified in court and whose identity was "known to her alleged persecutors" from "confidential informants whose aid to law enforcement was not public."[22] Here, Guzman did not communicate secretly with the police. His ordeal began when he was seen in public being questioned by and talking to the police. His identity was known to his persecutors just as it would be if he had testified in court. The same logic that led to our conclusion in *Garcia* compels us now to hold that persons who publicly provide assistance to law enforcement against major Salvadoran gangs similarly share a common, immutable characteristic.

A group consisting of persons who publicly provide assistance to law enforcement against major Salvadoran gangs is also defined with particularity.[23] Particularity requires "a clear benchmark for determining who falls within the group"; a proposed group must "be discrete and have definable boundaries"—not "amorphous, overbroad, diffuse, or

---

[22] *Id.* at 504 n.5.

[23] The BIA in its decision addressed only the immutability and social distinction prongs of the particular social group test. Ordinarily, the proper course would be to remand to the BIA to determine whether the group we now define satisfies the particularity requirement. However, "where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration." *Yusupov v. Att'y Gen.*, 650 F.3d 968, 993 (3d Cir. 2011) (internal quotation marks omitted). The particularity requirement for this group we have defined presents such a case.

11

subjective."[24]  Like a group of witnesses who have testified in court against violent gangs, a group of witnesses who have publicly provided assistance to law enforcement against major Salvadoran gangs "has definable boundaries and is equipped with a benchmark for determining who falls within it" sufficient to satisfy the particularity requirement.[25]

Finally, this group is socially distinct within Salvadoran society.  To be socially distinct does not mean "ocular" visibility.  "[R]ather [the group] must be perceived as a group by society."[26]  Providing assistance to law enforcement in public, like testifying in court, "lends itself to societal recognition," since "all are readily aware of the group and its members, not just those that are being provided information."[27] [28] [29]

We thus hold that a group consisting of witnesses who have publicly provided assistance to law enforcement against major Salvadoran gangs meets all three criteria for being a

---

[24] *M-E-V-G-*, 26 I. & N. Dec. at 239.

[25] *Radiowala v. Att'y Gen.*, 930 F.3d 577, 583 (3d Cir. 2019).

[26] *M-E-V-G-*, 26 I. & N. Dec. at 240.

[27] *See Radiowala*, 930 F.3d at 583.

[28] Decreto No. 1029/2006, Ley Especial para la Proteccion de Victimas y Testigos ["Special Law for the Protection of Victims and Witnesses"], (May 11, 2006), at p. 2, available at https://www.asamblea.gob.sv/sites/default/files/documents/decretos/171117_072930683_archivo_documento_legislativo.pdf (stating that the law applies to victims, witness, or other persons who are at risk or in danger due to their direct or indirect intervention in the investigation of a crime).

[29] *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013).

particular social group. Our analysis remains the same even though Guzman did not actually provide information to the Salvadoran police. Contrary to the IJ's unsupported assertion, asylum and withholding of removal under the INA may be granted on the basis of imputed, not just actual, membership in a particular social group.[30]

The BIA did not address several other elements of Guzman's application for relief under the INA—including whether Guzman is an imputed member of the group we described; whether the harm that Guzman has suffered in El Salvador, or will with reasonable probability suffer, rises to the level of persecution; whether Guzman's imputed membership in that group is a central reason for his persecution; whether the Salvadoran government is unable or unwilling to control MS-13; and whether it is clearly probable that Guzman's life or freedom will be threatened upon removal. We leave these matters to the BIA on remand.[31]

Addressing Guzman's second argument that he is eligible for relief under the INA because he has been subject to persecution and has a well-founded fear of future persecution on account of his imputed anti-gang political opinion, the BIA's determination that Guzman has failed to show persecution on account of political opinion is supported by substantial evidence. It was not on account of his political opinions that he was persecuted but on account of his apparent cooperation with the police. Guzman claims that anti-gang political opinion was attributed to him based on his perceived cooperation with the police and refusal to join MS-13. In

---

[30] *Amanfi v. Ashcroft*, 328 F.3d 719, 729–30 (3d Cir. 2003).
[31] *Cf. Garcia*, 665 F.3d at 504.

13

determining whether an applicant was persecuted because of an imputed political opinion, we focus on whether "the persecutor attributed a political opinion to the victim, and acted upon the attribution."[32]   However, Guzman presents no evidence indicating that Teco, Pelón, or the other MS-13 members who battered him did so for any reason other than his perceived assistance to the police; nor is there evidence that any of them believed his refusal to join MS-13 was a political expression.  In addition, neither of the two statements made to Guzman—that Guzman was a snitch and that he needed to collaborate with the gang—appears to be politically motivated, suggesting that Guzman's imputed political opinion was not a central reason for his treatment.  Because the evidence does not compel a contrary conclusion, we are not prepared to disturb the BIA's ruling that Guzman failed to carry his burden.[33]

---

[32] *Espinosa-Cortez*, 607 F.3d at 108 (internal quotation marks omitted).

[33] *See Elias-Zacarias*, 502 U.S. at 483 (rejecting the notion that an applicant must provide direct proof of his or her persecutor's motives, but adding that "since the statute makes motive critical, [the applicant] must provide *some* evidence of [motive], direct or circumstantial"); *Cruz-Diaz*, 86 F.3d at 332 (holding that the applicant's refusal to join the guerrillas in El Salvador "does not compel the conclusion that [he] will be subjected to persecution or other harm based on actual or imputed opinion, any more than any other citizen of El Salvador who participated in or refused to participate in the activities of either the guerrillas or the army"); *cf. Tilija v. Att'y Gen.*, 930 F.3d 165, 169–70, 172 (3d Cir. 2019) (holding that petitioner put forward a prima facie political asylum claim after providing credible testimony about being attacked and threatened for supporting a specific political party).

### B. Guzman's Application for Relief under the CAT

Article 3 of the CAT prohibits signatory parties to the Convention, including the United States, from expelling, returning, or extraditing a person to another country where "there are substantial grounds for believing that [that person] would be in danger of being subjected to torture." We have held that for an act to constitute torture, it must (1) cause severe physical or mental pain or suffering, (2) be intentionally inflicted, (3) be done for an illicit or proscribed purpose, (4) occur by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim, and (5) not arise from lawful sanctions.[34] To establish acquiescence, an applicant must demonstrate that, prior to the activity constituting torture, a public official was aware of it and thereafter breached his or her legal responsibility to intervene to prevent it.[35] Where the government does not have actual knowledge of the activity constituting torture, a petitioner may meet this standard by showing that the government is willfully blind to it.[36]

In *Myrie*, we laid out a two-part test for both torture and acquiescence. To determine whether a petitioner has met the burden of establishing that it is more likely than not that he would be tortured if removed, the IJ must ask (1) what is likely to happen to the petitioner if removed and (2) whether what is likely to happen amounts to torture.[37] To determine whether

---

[34] *Auguste v. Ridge*, 395 F.3d 123, 135 (3d Cir. 2005).

[35] 8 C.F.R. § 1208.18(a)(7).

[36] *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 65 (3d Cir. 2007), *as amended* (Mar. 6, 2007).

[37] *Myrie*, 855 F.3d at 516.

the applicant has established that public officials will acquiesce to the torture, the IJ must ask (1) how public officials will likely act in response to the harm the petitioner fears and (2) whether the likely response from public officials qualifies as acquiescence.[38] Whereas the first part of both inquiries is factual, the second part of both inquiries is legal.[39]

In affirming the IJ's denial of Guzman's CAT application, the BIA made two points in support of the IJ's determination that Guzman had not shown that he was likely to be tortured upon removal. First, it noted that Teco has since died. Second, it suggested that other gang members may not have a continuing interest in Guzman and are unlikely to torture him since they had twice allowed Guzman to leave. Thus, without engaging in any acquiescence analysis, the BIA stopped at either step one or two of the torture analysis after concluding that nothing that amounts to torture is likely to happen to Guzman. This conclusion is erroneous.

To reiterate, we owe no deference to factual findings and conclusions when they are based on "inferences or presumptions that are not reasonably grounded in the record, viewed as a whole."[40] It is clear to us, viewing the record as a whole, that Guzman suffered torture. Guzman's credible testimony indicates that members of MS-13 tracked down and assaulted him on two separate occasions after he was seen talking to the police. The severity of his treatment escalated as he was held at gunpoint on the second occasion. These encounters with MS-13 members also directly contributed to

---

[38] *Id.* at 516–17.
[39] *Id.*
[40] *Espinosa-Cortez*, 607 F.3d at 107.

16

his PTSD diagnosis. In other words, Guzman suffered both physical and psychological harm at the hands of MS-13, intentionally inflicted for the purpose of silencing him or punishing him.

It is also clear to us that Guzman is more likely than not to suffer the same treatment if he is removed to El Salvador. Teco was not the only one to have tracked down and assaulted Guzman. Despite Teco's death, there are other MS-13 members who have seen and know of Guzman. Pelón, for one, is presumably still alive and could again put a gun to Guzman's head. Others may have a personal stake in the matter if they were involved in the murder of Guzman's neighbors. In addition, Guzman's claims that MS-13 members have been looking for him are not disputed. The BIA brushes these facts and reasonable inferences aside and suggests, in effect, that Guzman should try his luck a third time. We disagree.

We have made clear that while the IJ and the BIA need not discuss every piece of evidence in the record, they are required to consider "all evidence relevant to the possibility of future torture" and they "may not ignore evidence favorable to the alien."[41] We emphasize that principle again today because we are troubled by the BIA's apparent distortion of evidence favorable to Guzman in this case.

One final point, the government of El Salvador had recognized that witnesses to crimes need protection and has enacted a program to protect witnesses during the investigation

---

[41] *Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019) (internal quotation marks omitted).

and trial of a case.[42]  Unfortunately, this program has apparently been limited to protection during trial and has even then been ineffective and underfunded.  Witnesses are still threatened and attacked.[43]  It is clear that this program is not sufficient to provide the protection to Guzman required to satisfy the CAT.

We will thus reverse the BIA's determination with respect to whether Guzman is likely to face torture upon removal and remand this case to the BIA to determine whether Guzman can show it is more likely than not that Salvadoran officials will consent to or acquiesce in his torture.

## III.  CONCLUSION

Having concluded that the BIA erred in dismissing Guzman's application for relief under the INA and the CAT, we will grant the petition for review, vacate the BIA's removal order, and remand this case to the BIA for further proceedings consistent with this opinion.

---

[42] Decreto No. 1029/2006, Ley Especial para la Proteccion de Victimas y Testigos [Special Law for the Protection of Victims and Witnesses], (May 11, 2006) at 2, available at https://www.asamblea.gob.sv/sites/default/files/documents/de cretos/171117_072930683_archivo_documento_legislativo.p df (stating that the law applies to victims, witnesses, or other persons who are at risk or in danger due to their direct or indirect intervention in the investigation of a crime).
[43] Immigration and Refugee Board of Canada, Issue Paper, El Salvador:  Information Gathering Mission Report, AR 402-03 (2016).