NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2843
_____

WILLIAM MARROQUIN-CORDOVA,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA 1:A209-418-182)
Immigration Judge: Matthew H. Watters
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 13, 2021

Before:  CHAGARES, JORDAN, and SCIRICA, *Circuit Judges*

(Filed: June 22, 2021)
_____

OPINION*
_____

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

JORDAN, *Circuit Judge*.

William Marroquin-Cordova ("Marroquin") argues that his uncles will persecute and torture him because he is a member of a particular social group ("PSG") comprised of descendants of his grandfather and because of his political affiliation with the Patriot Party. We agree with the Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") that Marroquin failed to demonstrate a nexus to a statutorily protected ground. It appears that his uncles targeted him out of greed and other economic resentment, not out of an animus toward the alleged PSG, nor because of his political opinion. For that reason, the IJ and BIA denied his claim for withholding of removal. The IJ and BIA also appropriately held that Marroquin's claim for relief under the Convention Against Torture ("CAT") lacks merit because he did not show that the authorities would acquiesce in torture. We will therefore deny the petition for review.

## I.    BACKGROUND[1]

Marroquin grew up with his parents and four siblings in Santa Cruz El Chol, Baja Verapaz, Guatemala. He is a member of the Patriot Party and, in 2014, began working on the second election campaign of Mayor Hector Adolfo Mayen-Alvarado ("Mayor Mayen"), who won elections in 2012 and 2016. Marroquin also worked for the local government in 2014 and 2015 as the Assistant of Public Services and the Promoter of Sports and Recreation, which were desirable government positions.

---

[1] The following is drawn primarily from Marroquin's removal hearing testimony and is consistent with the IJ's findings of fact.

He describes his uncles Raul and Pedro Cordova threatening to kill him "a lot of times" between 2014 and 2016, which eventually drove him out of Guatemala. (AR at 131.) He explained that his uncles were jealous of his government positions, given that they had lost their positions as bodyguards for the previous mayor of 16 years, who was a member of the competing Leader Party.[2] Additionally, they were envious of Marroquin's potential claim to land previously owned by his grandfather, who died in 2019. That land was supposedly devised to Marroquin's father, his uncle Raul, and another uncle, Nicholas, who has since died. Although Marroquin expressed some uncertainty as to the devisees, which may have included his uncle Pedro, he was confident that his father inherited a portion of the property, and that he, Marroquin, might then inherit his father's portion. His uncles Pedro and Raul did not "want to give anyone any share of" his grandfather's property, desiring it for themselves. (AR at 134.) Marroquin believed that to be the reason why his cousin, the son of his uncle Nicholas, was murdered after Nicholas's death. Marroquin testified that his cousin had told him shortly before his death that Raul and Pedro were making threats. Marroquin says that his father has not been killed, despite continuing to live in Guatemala, for a few reasons: because he may not have taken the land, because Raul and Pedro would not want to kill their brother, and because they see his father as a "good person."[3] (AR at 139.)

---

[2] He noted that, though he had previously had "small problems" with his uncles, those problems worsened after Mayor Mayen was elected and Marroquin started working for him. (AR at 148.)

[3] Marroquin's father submitted a statement, attached to Marroquin's application, but made no mention of inherited property, only claiming that he purchased land in 2008

After two years of threatening to kill him, Marroquin's uncles showed up at a soccer match where Marroquin was working, armed with guns. He escaped by motorcycle, claiming that townspeople attending the game stopped his uncles from getting to him. He did not return home because his uncles would occasionally (and continued thereafter to) fire guns at his house. He remained in Guatemala, but not in his home, for roughly another month. Marroquin did not file a report with the police and said that no one else had done so because his uncles have influence over the police and retained power from their former government jobs. He also did not ask the Mayor for help with the threats against him, thinking the Mayor "wouldn't be able to give [him] that help." (AR at 143-44.) He did, however, inform the Mayor's office that he was leaving his job due to the threats by his uncles. Even after arriving in the United States, he has continued to receive threats over Facebook and WhatsApp. He believes the threats are from his uncles acting under different identities.

Marroquin was ordered removed after his arrival in the United States, in September 2016, and he was in fact promptly removed. He illegally reentered the country in December 2016. In November 2019, the Department of Homeland Security

---

and sold that land in 2012. He mentioned economic extortion by gangs, but not from Marroquin's uncles. He did say that some family members were jealous of his land, including "Raul and Pedro Cordova, … who were upset that I owned this land and they took out their anger on my son, William [Marroquin-Cordova]." (AR at 232.) Marroquin had not spoken to his father before or after the statement but theorized that his father's focus on gangs was out of fear that Raul and Pedro would kill him if he made a declaration against them. Marroquin also testified that his father later sent his two younger brothers to live in the United States because he "was afraid that when they reached adulthood they would be receiving the same threats that I was receiving." (AR at 162.)

issued a Notice of Intent/Decision to Reinstate Prior Removal Order and shortly thereafter Marroquin completed a reasonable fear interview. His case was referred to an IJ based on that interview. He applied for withholding of removal and relief under the CAT, and a hearing was held in February 2020.

Although the IJ noted inconsistencies between Marroquin's testimony and his father's statement, he found Marroquin credible. Nevertheless, after evaluating Marroquin's withholding claim, the IJ concluded that "any harm that Mr. Marroquin contends would befall if he was returned to Guatemala is based not on any protected basis but instead based on personal conflicts or criminal acts or extortion." (App. at 12.) He also rejected Marroquin's contention the PSG of "descendants of [Marroquin's] grandfather," or a "political opinion" based on Marroquin's party affiliation, was a central basis of his alleged persecution, finding instead that jealousy of land inheritance was the primary cause of his uncles' threats. (App. at 11-13.) Additionally, the IJ noted that other members of the alleged PSG, such as Marroquin's father, suffered no persecution, and that it is speculative whether Marroquin would even inherit the property his uncles allegedly covet. Likewise, the IJ found Marroquin's PSG not cognizable because "there are multiple descendants [of his] grandfather" who are not being threatened or persecuted, "includ[ing] … his two brothers and sister, his father and the persecutors themselves." (App. at 14.) Lastly, the IJ rejected Marroquin's claim for relief under the CAT because he "failed to illustrate that any harm that he would face would be at the instigation of or with the consent or acquiescence of a public official." (App. at 16.)

The BIA affirmed the denial of Marroquin's withholding of removal claim, stating that "[t]he familial relationship has not been shown to be the motivating force for the threats, given that only some potential inheritors of the land were targets of threats[,]" and noting that Marroquin's father was not afraid of his brothers. (App. at 5.) It rejected Marroquin's request to provide corroborating evidence, because even if Marroquin were given an opportunity to corroborate his claim that his uncles murdered his cousin, that evidence would not change the personal nature of his uncles' threats against both him and his cousin. And it concluded that the IJ did not clearly err in finding that "the threats against the applicant existed before he began working for the mayor, which [it said] undermines his argument that his uncles targeted him due to his political opinion." (App. at 5-6.) It similarly affirmed the IJ's CAT holding. Marroquin has timely petitioned for review.

## II.    DISCUSSION[4]

Marroquin argues that the IJ and BIA erred in denying both his withholding of removal and his CAT claims. The government responds, and we agree, that the IJ and

---

[4] We have jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a), and Marroquin's reinstated order of removal is the equivalent of a final order. *See Debeato v. Att'y Gen.*, 505 F.3d 231, 235 (3d Cir. 2007) ("[Section] 1252(a)(2)(D) … permits us to exercise jurisdiction over … final orders that the Attorney General has reinstated pursuant to § 1231(a)(5)."). Constitutional claims and questions of law are reviewed de novo. *Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011). Factual findings of the agency are reviewed for substantial evidence. *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 590 (3d Cir. 2011). That means findings of fact must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Garcia*, 665 F.3d at 502 (internal citations omitted). "We may only consider the reasons provided by the [BIA], but where the [BIA] both adopts the findings of the [IJ] and discusses some of the bases for the [IJ's] decision, we have authority to review

6

BIA appropriately concluded that there is no nexus between Marroquin's withholding of removal claim and his alleged PSG or political opinion. We also agree with the IJ's and BIA's holding that the CAT claim fails because Marroquin has not established that the authorities would acquiesce in any alleged torture he says he will suffer if he is removed to Guatemala.

### A. The IJ and BIA Properly Denied Withholding of Removal.

Marroquin's withholding of removal claim lacks nexus to a PSG because his evidence shows that his uncles were not motivated by his being a descendant of his grandfather. Nor has he shown that they threatened him based on their differences in political affiliation. Instead, the evidence shows that, if anything, his uncles were motivated by economic jealousy over his potential property rights and his government patronage positions. They were aware of his economic and professional situation because they were part of the same family unit, but kinship ties must be more than the basis of knowledge about a victim; they must be a central reason for the persecution.[5]

---

the decisions of both the [IJ] and the [BIA]." *Saravia v. Att'y Gen.*, 905 F.3d 729, 734 (3d Cir. 2018) (internal quotation marks and citation omitted).

[5] In his briefing, Marroquin additionally argues that remand is required for the IJ to more fully consider his asserted PSG and because the BIA erred in not considering whether Marroquin had experienced past persecution. The government acknowledges in supplemental briefing that it has waived any defense to a challenge by Marroquin of the agency's finding on the cognizability of his asserted PSG. Instead, it asks that we assume cognizability and rule on lack of nexus, which we do herein. Marroquin also argues he should have been given the opportunity to corroborate his claim that his uncles murdered his cousin. The BIA rejected that argument because such corroboration would not change the IJ's nexus holding, and we agree.

A noncitizen pursuing withholding of removal "bears the burden of proving that he will more likely than not face persecution on account of … [a] protected ground[]." *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 684 (3d Cir. 2015). This means that the protected ground was "a central reason for [the alleged] persecution[.]" *Matter of A-B-*, 27 I.&N. Dec. 316, 330 (A.G. 2018). Those protected grounds include "race, religion, nationality, membership in a particular social group, [and] political opinion." 8 U.S.C. § 1231(b)(3)(A). "Conflicts of a personal nature and isolated criminal acts do not constitute persecution on account of a protected characteristic." *Gonzalez-Posadas*, 781 F.3d at 685; *see also Romero v. Att'y Gen.*, 972 F.3d 334, 342 (3d Cir. 2020) ("[P]etitioner's fear of personal conflict … does not suffice to entitle him to relief[.]"). The motivations of a persecutor are a question of fact, while the ultimate determination of whether those motivations have a nexus to a protected ground is a question of law. *See Matter of N-M-*, 25 I.&N. Dec. 526, 532 (BIA 2011) ("A persecutor's actual motive is a matter of fact to be determined by the [IJ] and reviewed by us for clear error."); *see also Amanfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir. 2003) ("[W]e have a very deferential standard of review of the BIA's findings of fact and may only reverse these findings if the evidence compels us to do so[.]").

Marroquin claims that he was persecuted because he is part of a PSG defined as descendants of his grandfather. The evidence does not support that. He testified that his uncles (who are also part of that same alleged PSG) wanted land that he stood to inherit from his father, and so they targeted him as well as certain other family members who also stood to inherit a share of that property, such as his cousin. But his evidence shows

8

that his uncles did not target all members of the family, only those in line to inherit land, and only individuals in Marroquin's generation. Assuming the truth of his story, his uncles' motivation was quite clearly economic. In other words, they did not threaten Marroquin because he is in his grandfather's bloodline; they threatened him because he is supposedly going to inherit property. Marroquin even noted that they did not target his father, despite his father's more immediate claim to the land. Marroquin's father's declaration is consistent on this point, as is testimony from Marroquin during his removal hearing and in his I-589 application. (*See, e.g.*, AR at 232 (declaration by Marroquin's father that "Raul and Pedro Cordova, for example, were family members who were upset that I owned … land and they took out their anger on my son, William"); AR at 134 (testimony of Marroquin that the "dispute and problems [started] because … my uncles, they want to inherit the entire land [and] don't want to give anyone any share of it"); AR at 374 (reporting in the I-589 application that he "fear[s] that if [he] return[s] to Guatemala, [his] uncles will threaten to and seek to kill [him]" because they "want the land that [he] will inherit from [his] father").)

Marroquin also argued that his persecution was on account of his political opinion because he supported a mayor of a different party than the party for whom his uncles worked. That alleged nexus is, again, not supported by the evidence, which demonstrated only that Marroquin's uncles lost their patronage positions with the government at about the same time Marroquin gained his, and they were therefore jealous of his good fortune. Although Marroquin's uncles supported a different political party, he did not testify or present any evidence that their alleged persecution was driven by political disagreement.

9

(*See* AR at 129-30 (testifying that his uncles were "jealous of [his] position[s]," which were "good jobs[,]" "[b]ecause they previously worked for the municipality and they were then at that time unemployed and so because of jealousy, they wanted to try to harm [him]"); AR at 130 ("They threatened me because they stated that they felt jealous -- jealousy that I had that position because previously they had worked as body guards for the previous mayor.").) The IJ rejected Marroquin's claims of nexus to political opinion for that reason. (*See* App. at 13 ("Even though Raul and Pedro … were purported members of 'The Leader' party and had what appeared to be patronage positions as bodyguards to the prior mayor, there is no evidence that … Marroquin's … political activities … were the basis for any harm, threats or other adverse activities[.]").) We therefore agree with the IJ and the BIA that Marroquin's withholding of removal claim lacks merit due to lack of nexus to a protected ground.

B. **The IJ and BIA Properly Denied Relief under the Convention Against Torture.**

Eligibility for protection under the CAT requires an applicant to show "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 310-11 (3d Cir. 2011) (citation omitted); 8 C.F.R. § 208.16(c)(2). The applicant must also show that the government will acquiesce to such torture, meaning he "must demonstrate that, prior to the activity constituting torture, a public official was aware of it and thereafter breached his or her legal responsibility to intervene to prevent it." *Orellana v. Att'y Gen.*, 956 F.3d 171, 181 (3d Cir. 2020). "The applicant can meet this standard even where the

10

government does not have actual knowledge of the torturous activity if he produc[es] sufficient evidence that the government [ ] is willfully blind to such activities." *Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017) (quotation marks and citations omitted). Findings concerning how government officials will respond to any mistreatment are factual, while the question of whether that response constitutes acquiescence is a legal one. *Id.* at 516-17.

Marroquin argues that the BIA's decision provides too little explanation to adequately address his arguments. *See Myrie*, 855 F.3d at 517 ("In order for us to be able to give meaningful review to the BIA's decision, we must have some insight into its reasoning." (quoting *Awolesi v. Ashcroft,* 341 F.3d 227, 232 (3d Cir. 2003)). He also argues that the BIA's findings under the CAT are not supported by substantial evidence, because it "overlooked evidence explaining why [he] never sought help from the police." (Opening Br. at 35.) He says that the BIA should have looked to his testimony "that his uncles have a lot of influence over the police, and that the police would be afraid to act in defiance of them." (Opening Br. at 35 (citing AR at 141).) As support for his argument, he notes that he informed the office of the Mayor that he would not return to work because his uncles were trying to hurt him, and he says he submitted country conditions articles and a Department of State report on police corruption and inefficacy.

Contrary to Marroquin's complaint, however, the IJ and BIA adequately explained their holdings. The IJ held that "the facts and evidence [do not] indicate that … the threats constituted torture" and that Marroquin "has failed to illustrate that any harm that he would face would be at the instigation of or with the consent or acquiescence of a

11

public official." (App. at 16.) The IJ further explained that Marroquin never sought help from the police, nor did he seek help from the political leaders for whom he worked. He reasoned that Marroquin's bare testimony that the authorities could not or would not help was not enough to demonstrate acquiescence. The BIA affirmed that conclusion, noted the IJ's reasoning, and cited to the relevant portion of the IJ's decision. That is sufficient for our review, *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004), and sufficient to support the denial of CAT relief.

## III. CONCLUSION

For the foregoing reasons, we will deny Marroquin's petition for review.