PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3480
_____

UBAIDULLAH ABDULRASHID RADIOWALA,
a/k/a Obed Radiowala, a/k/a Obaid Radiowalla,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of a Decision of the
United States Department of Justice
Board of Immigration Appeals
(A093-454-642)
Immigration Judge:  Virma A. Wright
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 27, 2019

Before: CHAGARES, GREENAWAY, JR. and
GREENBERG, *Circuit Judges*.

(Filed: July 22, 2019)
_____

OPINION
_____

Melvin R. Solomon, Esq.
Parsekian & Solomon
140 Main Street
Hackensack, NJ 07601
     Counsel for Petitioner

Rachel L. Browning, Esq.
Jessica E. Burns, Esq.
Maarja T. Luhtaru, Esq.
Joesph H. Hunt, Esq.
Keith I. McManus, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
       Counsel for Respondent

GREENAWAY, JR., *Circuit Judge*.

We are a nation of immigrants, and immigrant stories. And Ubaidullah Abdulrashid Radiowala's story has the makings of a compelling one. He entered the United States on a visitor's visa in April of 1998, with his wife and two children. He testified that he started out supporting a family of four on $300 a week, while living in a residence with two other families. His efforts over the course of the next two decades were met with relative success: he developed a lucrative

2

business that enabled him to remain the sole provider for his mother in India, his wife and two children who emigrated with him, and the two children he has had since, both of whom are United States citizens. For this group, he bears the entire financial burden on everything: from all household expenses to the rent and college tuition of three of his children. His fourth child is currently in high school.

He was arrested during a traffic stop in 2017, and subsequently charged as removable. The Immigration Judge ("IJ") presiding over his case denied his application for relief, determining that he was ineligible for cancellation of removal, asylum, withholding of removal, and relief under Article III of the Convention Against Torture ("CAT"). The Board of Immigration Appeals ("the Board") affirmed. Radiowala filed this petition for review, primarily asking that we consider his relatively non-existent criminal history and his role as the sole provider for his family. However, the principal avenue for doing so—cancellation of removal—is a ground on which the Board's decision is largely unreviewable. None of the other avenues fit his case—Radiowala became ineligible for asylum over 19 years ago, the proposed social groups of which he is a part are not legally cognizable, and substantial evidence supports the Board's determination that he is unlikely to be tortured if returned to India.

We must therefore dismiss Radiowala's petition in part, and deny it in part.

## I.

Radiowala entered the United States over 20 years ago, in order to escape the reach of a notable Indian gangster by the name of Dawood Ibrahim. Radiowala was arrested during a

vehicle stop in New Jersey, on September 20, 2017.[1]  Pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), the Department of Homeland Security charged him as removable because he was present in the United States without having been admitted or paroled. Radiowala conceded the charge but applied for cancellation of removal under 8 U.S.C. § 1229b(b)(1), asylum under 8 U.S.C. § 1158(b)(1)(A), withholding of removal under 8 U.S.C. §

---

[1] It bears mention that, in August of 2015, Interpol issued a Red Notice for Radiowala's arrest.  The Notice alleged that, in August of the previous year, he conspired with others in India to extort a Bollywood movie producer.  The Board did not at all premise its determinations on this Notice, however, as it was not required to do so.  Indeed, Interpol makes clear that it "cannot compel the law enforcement authorities in any country to arrest someone who is subject of a Red Notice," as "[e]ach member country decides for itself what legal value to give a Red Notice . . ."   Interpol, *Red Notices*, https://www.interpol.int/INTERPOL-expertise/Notices/Red-Notices (last visited July 1, 2019).  To this effect, Congress has not seen fit to prescribe that an Interpol Red Notice alone is an independent basis for removal.  Nor has it endeavored to make it an express consideration for any of the reliefs sought by Radiowala.  Relatedly, the Department of Justice's view is that, by itself, a Red Notice is not a sufficient basis for arresting someone, for its issuance often falls short of what the Fourth Amendment requires.  *See* Department of Justice, *Interpol Frequently Asked Questions*, https://www.justice.gov/interpol-washington/frequently-asked-questions#thirteen (last updated April 29, 2019).  We thus proceed as the Board did and give no weight to the existence and content of the Red Notice in this case.

4

1231(b)(3)(A), and protection under the CAT, 8 C.F.R. §§ 1208.16–18. In support of his application, he provided testimony and documentation to the effect of the following:

In India, Radiowala was a rickshaw driver[2] who doubled as a paid confidential informant for a police officer. He was enlisted by an officer by the name of Vijay Salesker, and primarily sought information about a gang known as "the Arun Gawli Gang." A.R. 252. From 1994 to 1998, Radiowala would obtain information by way of various gang members who took his rickshaw and would relay this information to Salesker. The content varied, ranging from extortion activities to information regarding a potential homicide. The compensation varied accordingly—approximately 2,000 to 6,000 rupees based on the value of the information Radiowala provided.

In 1996, Radiowala began serving as the driver for a gangster by the name of Hussain Vastra. He continued his informant work in this capacity. Sometime later, it was discovered that Vastra was also an informant, both by Radiowala and by a smuggler by the name of Dawood Ibrahim. This discovery did not bode well for Radiowala: he was soon discovered to also be an informant and faced death threats from those working for Ibrahim, including gang members and police officers. Notably, those individuals "blame[d] him for the information that was "pass[ed] on" by Vastra. A.R. 161–62 (testifying that "they put everything on me"). Radiowala

---

[2] In this context, a rickshaw is a three-wheeled car that is operated in a manner similar to a taxi.

turned to officer Salesker, who in turn assisted him in obtaining a passport under an alias.

By way of a visitor visa, Radiowala arrived in the United States in April of 1998, along with his wife and two children. They have remained here since. He initially had to support his family on $300 a week while living in a residence with two other families. He went on to own a successful wholesale distribution company for beauty products and over-the-counter drugs. His tax filings indicate that this company's gross profits range from $120,000 to $225,000 a year. He also had two other children, both of whom are United States citizens. Three of his children are in college and the fourth attends high school.

Through his business, Radiowala has been the sole provider for his entire family. He lists his wife and all of their children as employees and pools together their income from the business into an account that pays for all household bills, tuitions, and other expenses, such as rent and car payments. In the words of Dr. Mark Silver—the New York state licensed clinical social worker who interviewed Radiowala's family on numerous occasions—Radiowala is "the primary caregiver in [his] family. . . . He's really the main source of financial support, and without [this] support, [there is] not only concern about basic necessities, rent and so on, but also continuing with payments for tuition for college, extracurricular needs, and so on." A.R. 198–99.

Radiowala insisted that this would all come to an end if he was removed to India. He testified that his business would come to ruin and, with it, the only source of financial support for his family—notably, his two immigrant children who are Deferred-Action-for-Childhood-Arrival ("DACA") recipients

6

would no longer have their tuition and rent paid for, the same is true of his college-age-United States-citizen daughter, and his high school-age child, who would not be able to receive the prescription ear drops that she needs. In addition, he testified that those working for Ibrahim would be able to find and kill him.

The Immigration Judge ("IJ") found this testimony to be credible, but nonetheless denied Radiowala's plea for relief on all scores. The Board affirmed, ultimately adopting the IJ's reasoning. Radiowala petitioned this Court to review the Board's decision. He also asked that we maintain the temporary stay of his removal order pending the resolution of his petition on the merits. We denied this request, so he has since been removed to India.

## II.

We nonetheless have jurisdiction to review the Board's decision under 8 U.S.C. § 1252(a). *Mendoza-Ordonez v. Att'y Gen. of U.S.*, 869 F.3d 164, 168 (3d Cir. 2017). Our review is limited to the reasons provided by the Board. *See Orabi v. Att'y Gen. of U.S.*, 738 F.3d 535, 539 (3d Cir. 2014) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) and *Li v. Att'y Gen. of U.S.*, 400 F.3d 157, 163 (3d Cir. 2005)). But we may also consider the IJ's opinion where the Board adopted or deferred to the IJ's reasoning. *Mendoza-Ordonez*, 869 F.3d at 169 (citing *Nelson v. Att'y Gen. of U.S.*, 685 F.3d 318, 321 (3d Cir. 2012)). We review constitutional issues and questions of law under a *de novo* standard and regard the Board's factual determinations as "conclusive unless any reasonable adjudicator would be compelled to conclude the contrary." *Id.* (citations and internal quotation marks omitted). This "extraordinarily deferential" standard

7

requires that we uphold the Board's findings so long as they are supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Garcia v. Att'y Gen. of U.S.,* 665 F.3d 496, 502 (3d Cir. 2011), *as amended* (Jan. 13, 2012) (internal quotation marks and citations omitted).

## III.

The facts of Radiowala's case render it principally one for cancellation of removal. Yet the Board denied him this relief, and its determination is one that we do not have the power to review. The other forms of relief he seeks do not fit his circumstance—he became ineligible for asylum over 19 years ago, the proposed social groups of which he is a part are not legally cognizable, and substantial evidence supports the Board's predictive finding that he is unlikely to be tortured if returned to India. We must therefore dismiss his petition as to his cancellation of removal claim and deny it in all other respects.

## A. Asylum

As we alluded, a petitioner in Radiowala's position would typically look to cancellation of removal as the avenue for relief. This is because this avenue takes into account what a petitioner has done with her time in the United States. Indeed, it requires that a petitioner establish (1) continuous physical presence in the United States for the ten years preceding the application, (2) good moral character, (3) that she has not been convicted of certain criminal offenses, and (4) that her removal would cause "exceptional and extremely unusual hardship to [her] spouse, parent, or child, who is a United States citizen or [a noncitizen] lawfully admitted for

8

permanent residence." *See* 8 U.S.C. § 1229b(b). In essence, it is an expression that, although you entered our nation without our permission (or overstayed your welcome), we will allow you to remain if you have behaved and if removing you after so much time has passed would result in a particular kind of hardship.

Unfortunately for Radiowala, however, the IJ and Board foreclosed this avenue when they determined that, although he met the first three requirements, he could not show that the requisite hardship would result from his removal. In the Board's view, despite what Radiowala has accomplished and how much his family currently depends on him, the hardship that his qualifying relatives—his two citizen children—would suffer if he were to be removed would not be substantially beyond what typically results from removal. A.R. 3; *see also In re Monreal-Aguinaga*, 23 I. & N. 56, 69 (BIA 2001) (defining "exceptional and extremely unusual hardship" as harm to qualifying relatives that is "*substantially beyond that which would ordinarily be expected to result from the alien's deportation*") (quoting H.R. Conf. Rep. No. 104-828).

This decision cannot be reviewed by a court unless the issue for review is whether the Board or IJ applied the appropriate standard. *See Patel v. Att'y Gen. of U.S.*, 619 F.3d 230, 233 (3d Cir. 2010) ("We lack jurisdiction to review discretionary decisions made pursuant to 8 U.S.C. § 1229b, including 'exceptional and extremely unusual hardship' determinations . . . [except where the issue is] whether the IJ used the correct legal standard to reach this determination."). Radiowala has made no argument that the Board used the incorrect standard.

We are therefore precluded from reviewing the Board's determination on this issue.

### B. Asylum, Withholding of Removal, and Relief under the CAT

Radiowalla turns to asylum, withholding of removal, and relief under the CAT as alternatives. But none fit his case.

1.

Radiowala's asylum[3] and withholding claims are both premised on the fear that, if returned to India, he would be persecuted on account of his membership in two particular social groups. The first is comprised of "former criminal informants who testify against criminal gangsters, mafia, criminal delinquents, and members of organized crime," and the second consists of "persons targeted precisely for their willingness to speak the truth at great risk to themselves." A.R.

---

[3] An asylum petitioner must apply for the relief within one year of her entering the United States, regardless of whether she was admitted or paroled. *See* 8 U.S.C. § 1158(a)(2)(B). At the time of his application, it had been nearly 20 years since Radiowala entered the United States, so the Board and IJ concluded that he is not eligible for asylum. Radiowala informs this Court that he "is not seeking review of the time-barred asylum filing," Pet'r. Op. Br. n.1, but he references the relief in other parts of his brief, *id.* at 13, 17–23. The asylum and withholding analyses are the same in this context, so even if we set aside the Board's untimeliness determination—which we do not—Radiowala's asylum claim fails for the reasons that follow.

5–6, 59. Though asylum and withholding are two separate forms of relief with different standards of proof, a petitioner who bases his or her claim for either on membership in a particular social group must, *inter alia*, establish that the particular social group in question is legally cognizable. *S.E.R.L. v. Att'y Gen. of U.S.*, 894 F.3d 535, 544 (3d Cir. 2018) (citing *Fatin v. I.N.S.*, 12 F.3d 1233, 1240 (3d Cir. 1993)). The Board adopted the IJ's ruling that Radiowala is not a member of a group that meets this requirement. There is substantial evidence in the record to support this finding.

To be legally cognizable, a proposed social group must be (1) composed of members who share a common, immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *See S.E.R.L.*, 894 F.3d at 540. A characteristic is immutable if it is one that a person cannot change or should not be required to change as a matter of conscience to avoid persecution. *Id.* at 543. A group is particularized if it is discrete, has definable boundaries—as opposed to being overbroad, diffuse, or subjective—and its definition provides a benchmark for determining who falls within it. *Id.* at 547. And social distinction requires "evidence that the society in question recognizes a proposed group as distinct." *Id.* at 551. The latter two—particularity and social distinction—differ in that the former speaks to "'the outer limits[] of a group's boundaries,'" and the latter focuses on "'whether the people of a given society would perceive a proposed group as sufficiently separate or distinct.'" *Id.* at 548 (citations omitted).

As to Radiowala's first proposed group, we have previously held that a group consisting of "witnesses who have the 'shared past experience' of assisting law enforcement against violent gangs that threaten communities in Guatemala"

11

is legally cognizable. *Garcia*, 665 F.3d at 504. We reasoned that the shared experience of having testified against violent gang members is a common, immutable characteristic that the group members could not change "because it is based on past conduct that cannot be undone," and, "[t]o the extent that members . . . [could] recant their testimony, they should not be required to do so." *Id.* (internal quotation marks omitted). In addition, the group is particularized: a group essentially comprised of those who have testified in court has definable boundaries and is equipped with a benchmark for determining who falls within it. Equally, the act of testifying also lends itself to societal recognition—generally, speaking in open court means that all are readily aware of the group and its members, not just those that are being provided information or potential persecutors who are forever seeking to ferret out informants. *See id.* n.5 (distinguishing this group from confidential informants on the basis that their aid to the law enforcement is public, and their identity is readily known to their persecutors).

The Board concluded that such a group is legally cognizable. A.R. 5 ("Witnesses who have the shared past experience of testifying in prosecution against violent gangs can constitute a particular social group.") (citing *Garcia*, 665 F.3d at 504). But the record is devoid of evidence that Radiowala actually testified against anyone. As a result, the Board and IJ concluded that Radiowala had not demonstrated that he was a part of this group.

We agree—all Radiowala has put forth is that he was a paid confidential informant that relayed information to one particular officer. To this effect, the group of which he is a member is simply one of paid confidential informants in India. It indeed has some similarities to the one he proposed. The

12

characteristic of having provided information to aid law enforcement is immutable in the sense that it also derives from past conduct and thus cannot be changed, nor should one be required to change it. There might also be a basis for concluding that the group is sufficiently particularized: the record is unclear, but regularly receiving payment from government officials theoretically offers a basis for identifying group members and a definable boundary.

The potential for similarity stops there, however, as nothing in the record indicates that the community in India perceives paid confidential informants as a distinct group in society. *See S.E.R.L.*, 894 F.3d at 548. Radiowala's sole argument to the contrary is that "'society's perception' like that of Officer Salesker is what counts." Pet'r. Op. Br. 20. However, though relevant, by itself, the perception of the particular officer to whom an informant provides information does not demonstrate that society recognizes a group comprised of those who do so. Rather, the inquiry is "whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some *significant* way." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 238 (BIA 2014) (emphasis added). By definition, paid *confidential* informants provide aid to law enforcement privately. So, without more, a group comprised of them is indistinguishable from those in the general public whom a criminal gang might otherwise suspect as having informed on it. *See In Re C-A-*, 23 I. & N. Dec. 951, 960–61 (BIA 2006). That, like Radiowala, the group members' informant status may have, by a means unlike and other than testifying publicly,

13

been disclosed to alleged persecutors does not change the analysis.[4]

      We conclude that this is not a legally cognizable group. In reaching this conclusion, the distinction we draw between this group and one comprised of informants who have publicly testified is consistent with that drawn by the Board and every other circuit to have spoken on the issue. *See, e.g.*, *id.* at 960 (explaining that a proposed group of confidential informants lacks social visibility because "the very nature of the conduct

---

[4] Indeed, the persecution faced by informants whose status is assuredly disclosed is markedly different from those who, like many in the public, are merely perceived as, or suspected of, being informants. For example, in *Garcia*, the persecution one of the petitioners faced was distinctly severe when the persecutors were assured that she was an informant than when they merely suspected it. *Compare* 665 F.3d. at 500 (receiving a telephone call indicating "concern[] that [she] would report . . . to the police") *with id.* at 500–01 (receiving threatening phone calls despite "around the clock" protection "by armed security teams" and being "moved from hotel to hotel as many as twelve times in three months," one of which was from "an unknown individual who said that [the petitioner] was being watched during her first court appearance and that if she testified, she and [her sister] would be killed. The caller also mentioned that [an affiliate] knew where her mother and [her sister] were living in the United States"). Thus, although Garcia's persecutors suspected her of being an informant long before she testified in open court, we relied on her act of publicly testifying in distinguishing her case from those involving proposed social groups of confidential informants. *See id.* at 504 n.5.

at issue is such that it is generally out of the public view");[5] *Ngugi v. Lynch*, 826 F.3d 1132, 1138 (8th Cir. 2016) (rejecting a proposed social group of "witnesses to the criminal activities" of a group in part because there was no evidence that the petitioner "ever served as a witness against the [group] in any public proceedings"); *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1093 (9th Cir. 2013) (distinguishing prior cases in which a gang-related proposed social group was rejected from those involving "the very specific situation of testifying against gang members in court" as "for those who have publicly testified against gang members, their 'social [distinction] is apparent'"); *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) (concluding that a group comprised of family members of those who testified against MS–13 was a cognizable particular social group); *Castillo-Arias v. Att'y Gen. of U.S..*, 446 F.3d 1190, 1197–98 (11th Cir. 2006) (rejecting a proposed group of noncriminal informants working against the Cali drug cartel in part because the very nature of their activity prevents them from being recognized by society at large).

Radiowala's second proposed group is a non-starter. A group of persons "targeted" for their "willingness to speak the truth at great risk to themselves" is defined by the harm or potential harm posed to its members. In setting forth the particularity and social distinction requirements, the Board

---

[5] As the Board clarified in *Matter of M-E-V-G-*, the social distinction requirement does not mean "[l]iteral or 'ocular' visibility"; rather, the focus is "on the extent to which the group is understood to exist as a recognized component of the society in question." 26 I. & N. Dec. 227, 238–39 (BIA 2014).

reaffirmed its determination that "persecutory conduct alone cannot define a group." *S.E.R.L.*, 894 F.3d at 549 (internal quotation marks omitted) (quoting *Matter of W-G-R-*, 26 I. & N. Dec. 208, 215 (BIA 2014)). We accepted the Board's chosen course in *S.E.R.L.* As a consequence, a group so defined is not legally cognizable.

2.

Radiowala's petition for relief under the CAT also fails. To warrant CAT relief, a petitioner "bears the burden of establishing 'that it is more likely than not that . . . she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174–75 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). Torture is defined as the intentional infliction of severe pain and suffering, whether physical or mental, for illicit purposes, and "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* There is no subjective component to the above assessment. *Id.* A petitioner is required to meet her burden by objective evidence alone. *Id.*

The IJ found that Radiowala did not meet his burden. It found no evidence that anyone has been searching for Radiowala since he left India over 20 years ago, and that his pursuer (Dawood Ibrahim) is presently hiding in Pakistan. In the IJ's view, the fact that the officer to whom Radiowala provided information was killed ten years after he left was not enough to suggest that an informant of 20 years ago would be pursued, let alone tortured. This is because the officer remained high profile, and actively engaged in a national operation against Ibrahim, which is not true of Radiowala. The Board affirmed.

16

We review this decision for abuse of discretion, which requires reversal only if the decision was "arbitrary, irrational, or contrary to law." *Sevoian*, 290 F.3d at 174 (citations and internal quotation marks omitted). Here, we are not persuaded that Ibrahim's absence from India means that those he pursues are safe. Officer Salesker's death counsels otherwise, to the extent that it was at the hands of associates of Ibrahim. However, at the time of the Board's decision, Radiowala had been absent from India for nearly 20 years and there was no evidence that harm or threats came to anyone—*i.e.*, his mother who remained in India—on his behalf. To this effect, the Board and IJ are correct to point out that Officer Salesker independently continued his pursuit of Ibrahim. As a result, we cannot say that it was an abuse of discretion to conclude that Radiowala's fear of torture was "too speculative to merit protection." A.R. 62.

Radiowala's sole argument to the contrary is that "[h]e testified that the police officials in India worked with the criminal gangster[s] and he was afraid of the police as well." Pet'r. Op. Br. 22. Even if we accepted that this testimony demonstrates that what Radiowala could *possibly* face has one of the five elements of torture—an act by or at the instigation of or with the consent or acquiescence of a public official—it does nothing to undercut the IJ's finding that he is unlikely to be pursued in the first instance.

## IV.

For all of these reasons, we will dismiss the petition for review as to Radiowala's cancellation of removal claim and deny it in all other respects.