**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2990
_____

MANUEL AYALA-HERNANDEZ,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A201-246-220)
Immigration Judge:  Mirlande Tadal

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 21, 2022

Before: GREENAWAY, JR., PORTER and NYGAARD, <u>Circuit</u> <u>Judges</u>

(Opinion filed: August 5, 2022)
_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Petitioner Manuel Ayala-Hernandez, nominally proceeding pro se,[1] petitions for review of an order of the Board of Immigration Appeals (BIA) dismissing his appeal from the decision of an immigration judge (IJ) denying his application for relief under the Convention Against Torture (CAT).[2] For the reasons that follow, we will grant the petition for review.

I.

Petitioner, a citizen of El Salvador, entered the United States unlawfully in 2003 at the approximate age of thirteen. In 2011, the Department of Homeland Security initiated removal proceedings against him. Petitioner applied for, as relevant, deferral of removal under the CAT.

In preparation for his May 2021 hearing before the IJ, Petitioner submitted affidavits from both himself and his mother. (A.R. 292-95, 300-02.) Both affidavits explained that they had lived in an area of El Salvador controlled by the "MS-18 gang," which had a rivalry with another gang called "MS-13." Petitioner's affidavit stated that many of his childhood friends became members of MS-18 and attempted to recruit him into the gang. Both affidavits described an incident that occurred when Petitioner was 11

---

[1] In deciding this case, we have considered Respondent's argument that Petitioner's former counsel ghost wrote his brief, and we agree that the brief is not entitled to a liberal construction. (Respondent's Br. at 15-17).

[2] Petitioner additionally applied for asylum and withholding of removal. However, he conceded during the proceedings before the IJ that he had a criminal conviction for aggravated assault that constituted a particularly serious crime and was thus disqualifying for that relief. As a result, he sought only deferral of removal under the CAT.

or 12 years old, during which members of MS-13 branded his chest with the letters "MS," and were then chased off by his mother. Both affidavits stated that Petitioner, his mother, and his brother all subsequently moved to the United States (first his mother and then he and his brother about a year after her). Finally, the affidavits explained that Petitioner's brother was deported to El Salvador, where he was beaten by the gangs, and that members of both gangs, including the MS-18 members with whom Petitioner grew up, have threatened to kill Petitioner based on their perceptions that he either joined their rival gang or abandoned them.

Petitioner appeared at the May 2021 hearing before the IJ via video teleconference and with the assistance of an interpreter. His attorney appeared in person at the proceedings.[3] Petitioner testified about the same event from his affidavit, but he stated that it involved members of the "18 Gang," rather than MS-13, and that they attempted to tattoo onto his right hand the numbers "18" followed by "503,"[4] but that they were thwarted by his mother after only tattooing "503." (A.R. 228-32.) Petitioner was asked about the discrepancy between his testimony and his mother's affidavit,[5] and he explained that she was ill and confused. He also stated several times that no other gangs had tattooed him, that he did not have any other gang tattoos, and that he did not have an

_____

[3] The transcript does not indicate whether the interpreter appeared in person or via a separate video feed.

[4] "503" is the calling code for El Salvador. (A.R. 25.)

[5] Petitioner's affidavit was not mentioned during the IJ hearing.

3

"MS" tattoo. (A.R. 232, 235-36, 261, 273.) However, at various points of the hearing, Petitioner seemed potentially confused by questions about these issues, possibly as a result of translation and communication issues. (See A.R. 265-66, 268.) He further testified that in 2003, about a month before he left for the United States, members of MS-13 threatened to kill him if he did not join them. (A.R. 233-36.) By the end of 2003, Petitioner, his mother, and his brother had all moved to the United States. However, he testified that in approximately 2017, back in El Salvador, one of his uncles and one of his cousins were killed, and another cousin was disabled in a shooting. He believed that the gangs are responsible and carried out these attacks because he refused to join them and fled the country. He also believed that the gangs would find him because of the partial tattoo on his hand and because they knew his face. However, he confirmed that he could not be certain that any of the gang members he encountered were still alive in El Salvador.

The IJ denied relief. Although she found Petitioner's testimony to have been credible (despite noting some discrepancies uncovered during the hearing), she ruled that he had failed to meet his burden of demonstrating that he was eligible for deferral of removal under the CAT.

Petitioner appealed to the BIA and submitted an affidavit, (A.R. 25-26), and copies of purported text messages sent to his brother. (A.R. 28-31.) In the affidavit, he reiterated his version of events from the IJ hearing regarding the 18th Street Gang tattooing "503" on his hand, and he stated that his mother had mistaken the 18th Street Gang for MS-13. Additionally, he stated that after his mother left for the United States,

4

he moved to an area of El Salvador controlled by MS-13, where members of the gang branded "MS" onto his chest. He claimed to have been confused by his attorney's question during the IJ hearing when he "mistakenly" said that he did not have an MS tattoo. (A.R. 25.) Notably, a police report in the record indicates that Petitioner has "MS" tattooed both on his chest and his abdomen. (A.R. 424.) The submitted text messages to his brother referenced and made threats against an individual named "Neto," which Petitioner asserts is his nickname, derived from his middle name, Ernesto.

In October 2021, the BIA affirmed the IJ's decision and dismissed the appeal, without acknowledging or addressing Petitioner's new affidavit or the text messages. As relevant, the agency concluded that it was unlikely that the gang members with whom Petitioner had encounters in 2003, when he was 13, would recognize him; that he had not established with persuasive evidence that his family members were killed or attacked approximately four years before the hearing as retaliation for his refusal to join the gangs in the early 2000s; that the assertion that he would be tortured solely because he was tattooed was speculative; and that the assertion that government officials would turn a blind eye to such torture was also speculative.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a)(1). When, as here, the BIA adopts the findings of the IJ and discusses some of the bases for the IJ's opinion, our review encompasses both decisions. See Guzman v. Att'y Gen., 770 F.3d 1077, 1082 (3d Cir. 2014). We review legal conclusions de novo, Singh v. Att'y Gen., 677 F.3d 503, 508 (3d Cir. 2012), and we review the agency's findings of fact in denying CAT relief under the

5

substantial-evidence standard pursuant to which such findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020) (citation and internal quotation marks omitted).

### III.

To obtain CAT relief, Petitioner was required to demonstrate, through objective evidence, "that it is more likely than not" that he will be tortured if removed. See 8 C.F.R. § 1208.16(c)(2), § 1208.17(a); § 1208.18(a)(1); Sevoian v. Ashcroft, 290 F.3d 166, 175 (3d Cir. 2002). The determination as to whether Petitioner met his burden involves the two-fold inquiry set forth in Myrie v. Att'y Gen., 855 F.3d 509, 516 (3d Cir. 2017): (1) "whether an applicant has met the burden of establishing that it is more likely than not [that he] would be tortured if removed"; and (2) "whether public officials will acquiesce in the likely treatment." Quinteros v. Att'y Gen., 945 F.3d 772, 786 (3d Cir. 2019) (citation and internal quotation marks omitted). In deciding whether an applicant meets the first part of this standard, "the IJ must ask (1) what is likely to happen to the [applicant] if removed and (2) whether what is likely to happen amounts to torture." Guzman Orellana v. Att'y Gen., 956 F.3d 171, 181 (3d Cir. 2020). As for the second prong, the IJ must first "make[] a factual finding . . . as to how public officials will likely act in response to the harm the petitioner fears," and next "assess[] whether the likely response from public officials qualifies as acquiescence under the governing regulations." Myrie, 855 F.3d at 516. Under both prongs, the first inquiry is factual, while the second is legal. Id.

With regard to whether Petitioner established it was more likely than not that he would be tortured, the agency reasoned that it was unlikely that gang members would recognize Petitioner, but failed to reconcile Petitioner's and his mother's affidavits to the IJ, which together stated that some of the gang members he grew up with have beaten his brother and sent threats to his family that they will kill Petitioner if they ever see him again in their territory. Furthermore, to the extent that the agency characterized Petitioner as asserting that he would be tortured solely because he is tattooed, the agency misrepresented the evidence and arguments. Petitioner asserted that he will be tortured because the gangs that tattooed him will view him as a deserter (particularly the gang that was stopped midway through tattooing him), or they will view him a rival gang member. These assertions, alone, are more specific and individualized than merely asserting that he will be tortured because he is tattooed. In conjunction with the evidence mentioned above (that Petitioner grew up with some of the gang members, that they beat his brother upon his return, and that they sent threats to his family), the pertinent question is clearly broader than whether Petitioner would be tortured "solely" because he is tattooed.

Although the IJ and the BIA need not discuss every piece of evidence, we have explained that the agency cannot ignore evidence that is favorable to a petitioner without providing a reason. See Quinteros, 945 F.3d at 786 (stating that "if evidence is to be disregarded, we need to know why") (citation and punctuation omitted)); Kang v. Att'y Gen., 611 F.3d 157, 164 (3d Cir. 2010) ("The BIA may not ignore evidence in the record that favors the petitioner."); Chavarria v. Gonzalez, 446 F.3d 508, 517-18 (3d Cir. 2006) (holding that the BIA's decision was not supported by substantial evidence when it

"mischaracterized and understated" record evidence). From this record, we do not know how or why the agency discounted the import of the omitted evidence, and we are therefore unable to make a proper determination of whether the agency's ruling on the likelihood of torture is supported by substantial evidence. Cf. Quinteros, 945 F.3d at 787-88 (remanding for BIA to consider evidence undermining its conclusion that petitioner would not have been recognized as a gang member if returned to El Salvador).

Relatedly, we are troubled that the BIA did not acknowledge the new affidavit and evidence submitted on appeal. Although the BIA itself could not consider the evidence for purposes of deciding the appeal, see Saravia v. Att'y Gen., 905 F.3d 729, 734 (3d Cir. 2018), it is a common practice of the BIA to consider construing new evidence as a motion to remand for the further factfinding. While the BIA was not required to consider a remand based on the evidence, it is unclear from the BIA's decision that it was even aware that the evidence had been submitted. This is particularly concerning given that (1) the new affidavit sought to clarify important aspects of Petitioner's testimony before the IJ, (2) the transcript indicates there was some degree of confusion with interpreting and communicating during the video conference, and (3) a police report in the record indicates that the key clarification in the new affidavit—that Petitioner has an "MS" tattoo—is accurate.[6]

---

[6] We note that in January 2021, amendments to the pertinent regulations became effective which, as relevant, barred the practice of the BIA remanding to the IJ for further factfinding in this type of scenario. See Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020) (hereinafter, "the Rule"). However, two District Court have issued nationwide injunctions enjoining operation of the Rule. See Centro Legal de la Raza v. Exec. Off.

With regard to the question of whether Salvadorian public officials would acquiesce to Petitioner's torture, the agency's analysis was lacking. The BIA simply deemed governmental acquiescence speculative, with no explanation. The IJ noted that "the evidence in the record demonstrates El Salvador's continued efforts against gang and organized criminal activity," and that this Court "has previously found that reports of generalized brutality within a country do not necessarily show that a particular person would be in danger of being subjected to torture upon his return to that country." (IJ Dec. at 8) (citation omitted). With regard to the El Salvador's reported efforts against gang activity, we recently discussed the distinction between a country's efforts to stop the harm a deportee would face and its capability to do so, within the specific context of El Salvador. See Quinteros, 945 F.3d at 788 ("The Board was required to consider whether the government of El Salvador is capable of preventing the harm Quinteros would likely face."); see also id. at 792-93 & n.31 (McKee, J., concurring). Furthermore, the agency failed to address the 2020 Human Rights Report for El Salvador prepared by the United States Department of State, (A.R. 352-80), which contains information relevant to his issue that, at the least, necessitated some comment from the agency. See Pieschacon-Villegas v. Att'y Gen., 671 F.3d 303, 314 (3d Cir. 2011) (granting petition for review

for Immigr. Rev., 524 F. Supp. 3d 919, 980 (N.D. Cal. Mar. 10, 2021); see also Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev., No. 21-cv-00094-RJL, 2021 WL 3609986 (D.D.C. Apr. 4, 2021). At least two of our sister circuits have recognized the injunctions and, accordingly, deemed the prior versions of the relevant regulation to remain in effect. Adeyanju v. Garland, 27 F.4th 25, 34 n.6 (1st Cir. 2022); Berdiev v. Garland, 13 F.4th 1125, 1138 n.6 (10th Cir. 2021).

because the BIA appeared to ignore country conditions evidence that supported petitioner).

Accordingly, we will grant the petition for review, vacate the BIA's order, and remand the matter for the agency to address the statements in the affidavits submitted to the IJ that members of both gangs, including gang members with whom Petitioner grew up, have threatened to kill him based on their perceptions that he either joined their rival gang or abandoned them, as well as the relevant country conditions evidence, and to appropriately address the new evidence that Petitioner submitted to the BIA.