**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1724
_____

ISAAC DE JESUS CARRANZA-CORTEZ; ZULMA ELIZABETH QUINTEROS-DE
CARRANZA; E. M. C.-Q.,
Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS
(Agency Nos. A220-934-208, A220-934-209, A220-934-210)
Immigration Judge: Shifra Rubin
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
December 2, 2024
_____

Before: SHWARTZ, MATEY, and McKEE, <u>Circuit Judges</u>.

(Filed: January 22, 2025)
_____

OPINION[*]

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

SHWARTZ, Circuit Judge.

Isaac De Jesus Caranza-Cortez[1] petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). For the reasons set forth below, we will deny his petition.

I

Carranza-Cortez is a native and citizen of El Salvador who worked as a taxi and truck driver. Gang members demanded that he pay them the equivalent of $90 every fifteen days, and he did so for several years. Fearing reprisal, he initially did not report this activity to the police.

In 2021, Carranza-Cortez and his wife were driving home and they stopped for a man they thought needed a ride. The man was actually a gang member who drew a gun and threatened the couple, saying that "he knew [Carranza-Cortez] had money" and demanding $5,000. AR 887. He stated that if Carranza-Cortez failed to pay, he would kill him and his family. He gave Carranza-Cortez until the end of the month to pay. The gang member knew where Carranza-Cortez lived and Carranza-Cortez believed that the gang member would "do something" to him and his family if he did not pay. AR 77.

Carranza-Cortez left the family home that night and stayed with a relative who lived three hours away. There, Carranza-Cortez filed a police report describing his

_____

[1] Carranza-Cortez is the lead petitioner for his wife and child and so we refer to petitioners collectively as "Carranza-Cortez."

2

encounter with the gang member. The police told him that "they were going to help [him]," and would try to capture the perpetrator. AR 55. A few weeks later, Carranza-Cortez left El Salvador and entered the United States without authorization.

Thereafter, the Department of Homeland Security initiated removal proceedings pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). Carranza-Cortez applied for asylum, withholding of removal, and CAT relief, claiming that he was being persecuted for his membership in a particular social group ("PSG"),[2] as a Salvadoran witness to gang crimes.

The IJ ordered his removal and denied his requests for relief. As to his asylum and withholding of removal claims, the IJ determined that Carranza-Cortez (1) showed past persecution, but (2) failed to establish that "El Salvadoran witnesses to gang crimes" was a cognizable PSG because he did not testify as a witness or assist the police in prosecuting his persecutors. As to his CAT claim, the IJ concluded that Carranza-Cortez failed to show that he would likely suffer torture if he returned to El Salvador because (1) his past persecution did not amount to torture and, regardless, (2) he did not establish that public officials would acquiesce to torture because he left before the police could have acted on the report.

---

[2] Before the IJ, Carranza-Cortez asserted that he was persecuted based on his membership in two additional PSGs, but because he makes no argument about those groups before us, he has waived them. See Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993).

3

The BIA affirmed.  As to the asylum and withholding of removal claims, the BIA concluded that the proposed PSG, "El Salvadoran witnesses to gang crimes," lacked the particularity and social distinctness required of cognizable PSGs because Carranza-Cortez did not publically testify or receive protection for such cooperation.[3]  As to his CAT claim, the BIA concluded that Carranza-Cortez did not show that it was more likely than not that the Salvadoran government would acquiesce in his torture because, despite Carranza-Cortez's argument that widespread corruption in the Salvordan govermernt would lead to his torture, the existence of police corruption and ineffectiveness alone do not establish acquiescence to the harm an individual may face.

Carranza-Cortez petitions for review.

## II[4]
### A

Under the Immigration and Nationality Act, a noncitizen who enters the United States without permission is removable.  See 8 U.S.C. §§ 1182(a)(6)(A)(i),

---

[3] Neither the IJ nor BIA decided whether Carranza-Cortez established a fear of future persecution because he failed to show he was a member of a PSG.

[4] The IJ had jurisdiction under 8 C.F.R. § 1208.2, the BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3), and we have jurisdiction under 8 U.S.C. § 1252(a)(1).  See Garcia v. Att'y Gen., 665 F.3d 496, 502 n.4 (3d Cir. 2011).  When "the BIA issue[s] its own opinion, and d[oes]not simply adopt the opinion of the IJ, we review . . . the BIA's decision as the final agency decision."  Nelson v. Att'y Gen., 685 F.3d 318, 320-21 (3d Cir. 2012) (citations omitted).  "[T]o the extent the BIA deferred to or adopted the IJ's reasoning, we also look to and consider the decision of the IJ on those points."  Id. at 321 (citing Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir. 2006)).  We review legal determinations de novo and "accept factual findings if supported by substantial evidence."  Sesay v. Att'y Gen., 787 F.3d 215, 220 (3d Cir. 2015) (internal citation and quotation marks omitted).  Under the "deferential" substantial evidence standard, Sesay,

4

1227(a)(1)(A). A removable noncitizen may be eligible for asylum if he demonstrates that he is "unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [the country to which he would be removed] because of persecution or a well-founded fear of persecution on account of . . . membership in a [PSG]." 8 U.S.C. § 1101(a)(42)(A). A noncitizen may be eligible for withholding of removal if he shows "that it is more likely than not that [he] would be persecuted on account of . . . membership in a [PSG] . . . upon removal to [the designated] country." 8 C.F.R. § 1208.16(b)(2); see also 8 U.S.C. § 1231(b)(3) (statutory removal). A PSG must be "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." S.E.R.L. v. Att'y Gen., 894 F.3d 535, 540 (3d Cir. 2018) (internal citation and quotation marks omitted).[5]

Witnesses who have publicly testified against gangs or publicly cooperated with police may qualify as members of a cognizable PSG because both are socially perceptible

---

787 F.3d at 220, "the BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it," Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001); 8 U.S.C. § 1252(b)(4)(B).

[5] At issue here are particularity and social distinction. "'Particularity' addresses 'the "outer limits" of a group's boundaries and is definitional in nature,' whereas 'social distinction' focuses on 'whether the people of a given society would perceive a proposed group as sufficiently separate or distinct[.]'" S.E.R.L. v. Att'y Gen., 894 F.3d 535, 548 (3d Cir. 2018) (alteration in original) (quoting Matter of M-E-V-G-, 26 I. & N. Dec. 227, 241 (BIA 2014)). We review "the ultimate legal conclusion as to the existence of a

activities. Garcia v. Att'y Gen., 665 F.3d 496, 504 (3d Cir. 2011), as amended, (2012); Radiowala v. Att'y Gen., 930 F.3d 577, 584-85 (3d Cir. 2019) (holding those who assisted law enforcement may not claim membership in a PSG where there was no evidence that they testified against anyone); Guzman Orellana v. Att'y Gen., 956 F.3d 171, 178-80 (3d Cir. 2020) (holding one observed speaking with police was member of a PSG comprised of individuals who publicly assisted law enforcement because this group has "definable boundaries" and its members may be recognized within the society). Unlike the petitioner in Garcia, Carranza-Cortez has not publicly testified about the gang encounter, 665 F.3d at 504, and unlike in Guzman Orellana, he has not publicly cooperated with the police, 956 F.3d at 178. Rather, Carranza-Cortez filed a police report, then fled the country weeks later.[6] Witnessing a crime without taking any public action (e.g., testifying in court or assisting the police in a way that the community would know) does not qualify one as a member of a PSG because the limits of such a group would not be easily defined, nor would the group be socially distinct within the society. See Radiowala, 930 F.3d at 583-85 (declining to recognize informant's membership in a PSG, even though gang members learned informant's identity, because informant never

_____

[PSG]" de novo, and the factual findings underlying that conclusion for substantial evidence. Id. at 543.

[6] Although Carranza-Cortez argues that his police report was public because he made no attempt to hide his identity when he made it, substantial evidence supports the IJ's determination that Cararnza-Cortez did not publicly testify, his report was not known in the community, and he did not assist the police in apprehending or prosecuting the persectuor.

6

publicly testified); id. at 583 (noting that "the act of testifying . . . lends itself to societal recognition—generally, speaking in open court means that all are readily aware of the group and its members"); see also Guzman Orellana, 956 F.3d at 179 (a group who "publicly provide[s] assistance to law enforcement" is defined with particularity because, "[l]ike a group of witnesses who have testified in court against violent gangs ,. . . [this group] has definable boundaries and is equipped with a benchmark for determining who falls within it") (internal citation and quotation marks omitted).  Accordingly, the BIA properly concluded that Carranza-Cortez's proposed PSG lacks definable boundaries and social distinctness, and correctly denied him asylum and withholding of removal.

B

The BIA also correctly denied Carranza-Cortez CAT relief.  To be entitled to CAT relief, an applicant must show that "it is more likely than not that [he] would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2) (2021); see also Silva-Rengifo v. Att'y Gen., 473 F.3d 58, 64 (3d Cir. 2007) (explaining CAT applicant's burden).  Under the CAT, torture is:

> (1) an act causing severe physical or mental pain or suffering;
> (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

Myrie v. Att'y Gen., 855 F.3d 509, 515 (3d Cir. 2017) (quoting Auguste v. Ridge, 395 F.3d 123, 151 (3d Cir. 2005)); see also 8 C.F.R. § 1208.18(a)(1) (defining torture).

7

When Carranza-Cortez filed the police report, the police took down the details of the incident and informed Carranza-Cortez that "they were going to help [him]," and try to capture the perpetrator. AR 55. Under substantial evidence review, these facts support the BIA's conclusion that Carranza-Cortez failed to show governmental acquiescence to the private violence he fears. See Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001).[7] Thus, the BIA correctly denied Carranza-Cortez CAT relief.

## III

For the foregoing reasons, we will deny the petition.

---

[7] Our dissenting colleague points to the country condition reports to support the position that the record supports that the El Salvadoran government is unwilling or unable to protect Carranza-Cortez if he returned and thus, remand is necessary on the CAT claim. However, country condition reports showing that police are ineffective, corrupt, or slow to act alone do not establish acquiescence to gang violence where those reports also note police action in response to gang violence and crime. Galeas Figueroa v. Att'y Gen., 998 F.3d 77, 93 (3d Cir. 2021) (concluding no acquiescence when the government (i) investigates police reports, even if an applicant saw no action on the police report, or (ii) is otherwise ineffective); Valdiviezo-Galdamez v. Att'y Gen., 663 F.3d 582, 610 (3d Cir. 2011) (finding no acquiescence when an applicant made five police reports concerning gang encounters, but saw no progress).

McKEE, *Circuit Judge*, concurring in part and dissenting in part.

I agree with my colleagues that the IJ correctly concluded that Carranza-Cortez[1] met his burden of showing past persecution for purposes of establishing "Refugee" status under the INA. I also agree with my colleagues' conclusion that given controlling precedent, the IJ and BIA were correct in holding that Carranza-Cortez was not entitled to asylum or withholding of removal because he failed to show that his persecution was on account of his membership in a cognizable social group (PSG), i.e. "witness to gang crimes." That conclusion is based on an assumption that the police report Carranza-Cortez filed was not known in the community because he did not publicly testify against his persecutor, and he did not remain in El Salvador to assist the police in apprehending his persecutor.[2] My colleagues also conclude that Carranza-Cortez is not entitled to relief under the Convention Against Torture ("CAT") because evidence that the police informed him that they would investigate his claims and render "help," undermines his ability to prove the required element of governmental acquiescence.

For the reasons that follow, I must concur in Part A of the Majority Opinion (failure to prove a Particular Social Group). However, I write separately to highlight the naïve and cruel paradox that is endemic in requiring one to first risk violent retaliation before establishing membership in a PSG. I also write separately because I cannot agree

---

[1] "Carranza-Cortez is the lead petitioner for his wife and child, and so we refer to petitioners collectively as 'Carranza-Cortez.'" *See supra* Maj. Op. at 2, n.1.
[2] *See id.* at 7, n.6.

with Part B of the Majority Opinion affirming the denial of relief under the CAT despite the absence of a proper *Myrie* analysis.

## I.

Our court only recognizes "witnesses to gang crimes" as a PSG when that witness publicly testifies against, or publicly aids law enforcement in, the prosecution of a persecutor.[3] In *Radiowala,* we explained that one's membership in a PSG turns on "whether those with a common immutable characteristic are set apart, or distinct, from persons within the society in some *significant* way."[4] Among other prerequisites, the law requires that a proposed social group have particularity and social distinction.[5] "Particularity addresses the outer limits of a group's boundaries," whereas social distinction "focuses on whether the people of a given society would perceive a proposed group as sufficiently separate or distinct."[6]

We have interpreted this to mean that cooperation with police by filing a police report or informing on a perpetrator is not sufficient to establish membership in a PSG. Rather, the law also requires that such cooperation must be generally known in the community to establish one's membership in a PSG.[7] Given the absence of any such evidence here, my colleagues are forced to conclude that Carranza-Cortez's failure to

---

[3] *See Radiowala v. Att'y Gen.*, 930 F.3d 577, 584 (2019).
[4] *Id.* (quoting *Matter of M-E-V-G*, 26 I. & N. Dec. 227, 238 (BIA 2014)).
[5] *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 548 (3d Cir. 2018) (describing the BIA's test for determining membership in a PSG, which this Court adopted as reasonable).
[6] *Id.* (internal quotations omitted).
[7] *Radiowala,* 930 F.3d at 584.

testify against his persecutors, or otherwise aid in their prosecution, fatally undermines his claim to membership in a PSG. I am compelled to agree.

However, the tragic reality in El Salvador—and so many other gang-controlled countries—is that "intimidation and violence against complainants [] continues to contribute to a climate of impunity from criminal investigation and prosecution."[8] The prerequisite of public disclosure ignores record evidence that many victims of gang crimes, like extortion, repeatedly choose not to file reports out of well-founded fear.[9] In fact, the number of such reported cases in El Salvador saw a significant 35% decrease between 2009 and 2016 because of the violence imposed on those who report gang crimes to police.[10]

Yet, given the conditions precedent to establishing membership in the PSG Carranza-Cortez claims, it is not enough that asylum seekers have risked persecution by resisting the reign of terror unleashed on their communities by violent gangs. They must also have somehow publicly assisted in the prosecution of those gangs. But that is an unrealistic and cruel requirement that both ignores and contradicts reality. A realistic view of the situation would establish that, if a government is truly corrupted by and acquiescent to gang violence, gang activity will simply never be prosecuted. Thus, requiring asylum seekers to testify against gang members or assist in their prosecution is as paradoxical as it is nonsensical. There will be no prosecution and no opportunity to

---

[8] AR 239.
[9] "Many opt to pay rather than risk . . . their safety to file a report." AR 2506.
[10] *Id.*

3

testify.  The law's failure to recognize this reality is farcical.  It unjustifiably assumes some kind of criminal proceeding will be initiated.  That assumption is contradictory.

The likelihood that a prosecution or proceeding against the perpetrators will occur decreases as the level of violence and impunity increases.  Indeed, given the corruption that infests so many societies, it is much more reasonable to assume that a witness will disappear after filing a police report than to assume that such a report will result in an investigation or prosecution.[11]  The greater the lawlessness, the less likely it is that anyone can qualify as a Refugee based on being a witness to gang crimes.  Thus, this requirement often results in little more than a merciless "Catch 22" that denies many deserving applicants Refugee status despite doing all that can be expected of them.

I realize that there are practical considerations for requiring certain barriers to establishing membership in this PSG.  Thus, it is both understandable and necessary for the law to erect some restraints.  It is, however, regrettable that the barriers that have been imposed seem to be based more upon uninformed assumptions than reasonable assessments of societies where the rule of law is nonexistent.  Moreover, our precedent assumes that community members will only know of one's opposition to gangs if that person testifies or otherwise openly cooperates with police.  Yet, as the Court acknowledged in *Radiowala*, [12]  it is possible for community members to learn the

---

[11] Carranza-Cortez remained in El Salvador for two weeks after he filed a police report. *See* AR 464. Absent from the record is any indication that police initiated an investigation or followed up with Carranza-Cortez's report during that two-week period.
[12] There, gang members and police officers learned of a confidential informant's identity even in the absence of some public action. *Radiowala*, 930 F.3d at 584.

4

identity of even the most covert of petitioners—i.e. confidential informants.[13]  Indeed, my colleagues summarize *Radiowala* as "declining to recognize informant's membership in a PSG, even though gang members learned informant's identity, because informant never publicly testified."[14]

Communities have means of knowing the identities of those who oppose gangs, whether or not those individuals publicly testify or assist in any theoretical prosecution of violent gangs (which, as I have explained, is unlikely if the police are truly complicit and corrupt).  Membership in a PSG should not require overcoming insurmountable and unrealistic barriers. [15]  Accordingly, the law should allow flexible and realistic methods of proving that one's opposition to corruption and/or gangs is generally known in a given community.[16]

Given the grim dilemma that asylum seekers face, I can only hope that the law will evolve to adopt more practical criteria to determine membership in the PSG at issue today.  However, that day is not yet here and for the reasons my colleagues explain, I

---

[13] *See id.* at 580 (explaining that, in the absence of public testimony, petitioner and another community member discovered the identity of a confidential informant. Later, gang members and police discovered that petitioner also worked as a confidential informant).

[14] Maj. Op. at 7.

[15] And I wonder what more Carranza-Cortez, a civilian, could have done to aid the police than to provide them with the name, age, gang affiliation, location, and physical description of the perpetrator in question. *See* AR 924-25.

[16] *See* James Carr, Note, *Kill the Snitch: How Henriquez-Rivas Affects Asylum Eligibility for People Who Rep. Serious Gang Crimes to L. Enf't*, 91 Wash. L. Rev. 1313, 1343-54 (2016) (arguing that witnesses to gang crimes who report said crimes to law enforcement "passes both the BIA's three-prong test and the *Acosta* immutability standard followed by the [Third Circuit]").

must therefore agree that Carranza-Cortez has not established membership in a cognizable PSG under controlling law. I thus join Part A of the Majority Opinion.

## II.

My colleagues also conclude that Carranza-Cortez cannot prove governmental acquiescence for purposes of CAT relief because a police officer (or officers) of unknown rank assured him of police assistance.[17] However, the assertion of one local officer or officers, by itself, is simply not sufficient to negate record evidence that El Salvadoran "gangs reportedly have their own infiltrators in the police[.]"[18] When the BIA denies CAT relief, it "may not simply overlook evidence in the record that supports the applicant's case."[19] "We expect that it will examine the relevant data and articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made."[20]

The totality of evidence on this record is consistent with a conclusion that the government of El Salvador is unwilling or unable to protect Carranza-Cortez if he returns there. The BIA ignored voluminous evidence of police acquiescence in the Country Reports pertaining to El Salvador. A report from the United Nations High Commissioner for Refugees found that, despite the existence of certain legal protections against gang

---

[17] Carranza-Cortez testified before the IJ that, upon filing his police report, the police informed him that "they would continue the case [] maybe with the purpose of capturing this individual." AR 54-56; *see also id.* at 924-25 (detailing the translated Police Report, signed by Agent de Jesus Acevedo of the San Vicente police precinct).
[18] AR 238.
[19] *Ghanem v. Att'y Gen.*, 14 F.4th 237, 246 (3d Cir. 2021).
[20] *Quinteros v. Att'y Gen.*, 945 F.3d 772, 792 (3d Cir. 2019) (McKee, J., concurring) (internal quotations omitted).

6

crimes, "weaknesses and corruption in the Salvadoran security forces . . . contribute to creating a high level of impunity for crimes in El Salvador."[21] "[G]angs had reportedly penetrated the State through the police force."[22] And "84 percent [sic] of businesses that were subjected to extortion did not lodge a complaint with the police . . . due to threats by gangs and the gangs' practice of killing those who do report them."[23] In its 2021 Human Rights Report on El Salvador, the Department of State found that by September 2021, there were 95 accusations *filed against El Salvadoran police* for themselves committing crimes and offenses against citizens, including homicide.[24] On this record, requiring Carranza-Cortez to return to El Salvador with the *hope* of law enforcement intervention "could impose insurmountable obstacles to affording the very protections the community of nations sought to guarantee under the Convention Against Torture."[25]

Denial of CAT relief on this record undermines the policy, purpose, and intention "of the United States not to expel . . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."[26]

I believe we should remand the BIA's CAT determination for reconsideration under *Myrie v. Attorney General*.[27] Under the *Myrie* framework, the IJ must address two

---

[21] AR 238.
[22] *Id.*
[23] AR 239.
[24] AR 328-29.
[25] *Zubeda v. Ashcroft*, 333 F.3d 463, 474 (3d Cir. 2003), *abrogated on other grounds by Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005).
[26] *Roye v. Att'y Gen.*, 693 F.3d 333, 340 (3d Cir. 2012).
[27] 855 F.3d 509, 516 (3d Cir. 2017).

inquiries. First, s/he must determine what is likely to happen to the petitioner if removed; second, the IJ must ask whether what is likely to happen amounts to the legal definition of torture.[28]

Here, there was a finding of past persecution, but the IJ concluded that the past persecution Carranza-Cortez established did not "even remotely" amount to torture.[29] Then, without conducting the required inquiry, the BIA affirmed that Carranza-Cortez failed to show that it is more likely than not that he and his family would be tortured if removed to El Salvador. It similarly determined that a failure to remain in El Salvador to see whether the police acted on his report undermined his ability to prove governmental acquiescence. At minimum, our precedent required the IJ/BIA to explain why record evidence—demonstrating pervasive governmental corruption—was rejected.[30] The IJ/BIA should make a finding as to what will happen to Carranza-Cortez if he returns and determine if that rises to the level of torture. The failure to do so or to consider the totality of this record regarding circumstances in El Salvador "cannot withstand even our most deferential review."[31] If we are to give "meaningful review to the BIA's decision, we must have some insight into its reasoning."[32]

---

[28] The BIA reviews the first conclusion for clear error and reviews the second conclusion de novo. *Id.*
[29] AR 106.
[30] *See Ghanem*, 14 F.4th at 250.
[31] *Id.*
[32] *Myrie*, 855 F.3d at 517.

8

Accordingly, I respectfully dissent from my colleagues' conclusion that Carranza-Cortez's claims under the CAT were properly dismissed on this record.